# In the United States Court of Appeals for the Sixth Circuit

### Nos. 22-3176, 22-3666, 22-3794 & 22-3796 (consolidated)

ELECTRIC POWER SUPPLY ASSOCIATION, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

ON PETITIONS FOR REVIEW
OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

Jared B. Fish
Attorney

For Respondent
Federal Energy Regulatory
    Commission
888 First Street N.E.
Washington, DC 20426
Tel.: (202) 502-8101

FINAL CORRECTED BRIEF*: JUNE 21, 2023

---

\* This corrected brief conforms to the corrected joint appendix, which was also filed on June 21, 2023.

# Table of Contents

Page

INTRODUCTION ..................................................................... 1

STATEMENT OF ISSUES.......................................................... 4

STATEMENT OF FACTS ........................................................... 5

I.  Background.................................................................... 5

    A.  The Federal Power Act ............................................... 5

    B.  Overview of wholesale electric power markets ........................... 5

        1.  The transition to competitive wholesale power markets.... 5

        2.  PJM Interconnection, L.L.C. and the provision of power through competitive, wholesale power markets ............... 7

        3.  The PJM operating reserve markets ................................. 8

    C.  In March 2019, PJM filed a Federal Power Act Section 206 proposal to replace the Legacy Demand Curve with the Revised Demand Curve ........................................................... 14

    D.  The Commission's 2020 approval of PJM's proposal ............... 19

    E.  The Commission's 2021 motion for voluntary remand ............ 21

    F.  The Commission's 2021 order reversing its prior approval of PJM's proposal and holding that PJM failed to prove that the current Legacy Demand Curve is unjust and unreasonable ....... 24

SUMMARY OF ARGUMENT ................................................... 25

ARGUMENT ........................................................................ 28

I.  Standard of review ........................................................ 28

II.   The Commission, through its attorneys and at the direction of its
      Chairman, appropriately filed the 2021 Remand Motion to allow
      the agency to reconsider its 2020 Reserve Market Orders ................29

      A.   The Commission's filing of the 2021 Remand Motion is
           consistent with its statutory authority under the DOE Act ......30

           1.   The Commission's interpretation of the DOE Act is
                entitled to *Chevron* deference...........................................30

           2.   The APA's definition of "agency action" does not
                cover the 2021 Remand Motion .....................................32

           3.   The DOE Act does not displace the APA's definition of
                "agency action"................................................................36

           4.   The Chairman's direction to agency lawyers to file the
                2021 Remand Motion falls comfortably within his
                executive and administrative powers ..............................38

           5.   The Generators are wrong that the Commission may
                change its 2020 Reserve Market Orders only by using
                Federal Power Act Section 206.......................................40

      B.   The Chairman's direction to file the 2021 Remand Motion is
           consistent with the U.S. Constitution ......................................44

III.  The Commission reasonably found that PJM failed to meet its
      statutory burden of proving that the Legacy Demand Curve is
      unjust and unreasonable....................................................................50

      A.   The record shows that an $850/MWh Reserve Penalty Factor
           attracts sufficient reserve capacity ...........................................51

      B.   PJM and the Generators failed to prove that biasing of energy
           demand projections reflects a deficiency in the Legacy
           Demand Curve .........................................................................62

ii

C.   PJM and the Generators failed to prove that out-of-market payments made to reserve resources reflect a defect in the Legacy Demand Curve ............................................................. 65

D.   PJM and the Generators failed to prove that the step-wise Legacy Demand Curve is unjust and unreasonable .................. 68

E.   PJM and the Generators failed to prove that an unlikely, hypothetical future event of up-to $2,000/MWh opportunity costs requires deeming the $850/MWh Reserve Penalty Factor unjust and unreasonable ............................................... 70

F.   The Generators' complaint that FERC failed to consider regulatory stability concerns is incorrect as a matter of law; in any event, the Commission addressed the concern ............... 73

CONCLUSION ............................................................................. 78

# TABLE OF AUTHORITIES

**COURT CASES:** PAGE

*Allegheny Defense Project v. FERC,*
    964 F.3d 1 (D.C. Cir. 2020) (en banc) ...............................20–21, 35

*Ameren Servs. Co. v. FERC,*
    893 F.3d 786 (D.C. Cir. 2018) .....................................................41

*Biestek v. Berryhill,*
    139 S. Ct. 1148 (2019) .................................................... 28, 64, 67

*City of Winnfield v. FERC,*
    744 F.2d 871 (D.C. Cir. 1984) ...................................................14

*Consumer Energy Council of Am. v. FERC,*
    673 F.2d 425 (D.C. Cir. 1982)................................................... 39

*Del. Riverkeeper Network v. FERC,*
    45 F.4th 104 (D.C. Cir. 2022) ................................................... 45

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020)............................................................. 76

*Emera Me. v. FERC,*
    854 F.3d 9 (D.C. Cir. 2017)........................................ 15, 50, 71, 74

*Entergy Servs., Inc. v. FERC,*
    391 F.3d 1240 (D.C. Cir. 2004)...................................19, 41, 45, 64

*Fanin v. U.S. Dep't of Veterans Affairs,*
    572 F.3d 868 (11th Cir. 2009) ................................................. 34

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).......................................................60, 64, 67

*FERC v. EPSA,*
    577 U.S. 260 (2016) ........................................................ 5, 28–29

iv

## TABLE OF AUTHORITIES

**COURT CASES:**                                         **PAGE**

*Garland v. Ming Dai,*
    141 S. Ct. 1669 (2021) ...................................................75

*Granholm ex rel. Mich. Dep't of Nat. Res. v. FERC,*
    180 F.3d 278 (D.C. Cir. 1999) ......................................21

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ...................................................... 38

*Hirschey v. FERC,*
    701 F.2d 215 (D.C. Cir. 1983) ..................................... 36

*Hughes v. Talen Energy Mktg., LLC,*
    578 U.S. 150 (2016) ................................................. 8, 20

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ..................................................... 46

*Int'l Transmission Co. v. FERC,*
    988 F.3d 471 (D.C. Cir. 2021) .......................... 15, 50, 69

*J.L. Spoons, Inc. v. Dragani,*
    38 F.3d 379 (6th Cir. 2008) .......................................... 28

*Jones Bros., Inc. v. Sec'y of Labor,*
    898 F.3d 669 (6th Cir. 2018) ....................................... 45

*Ky. Utils. Co. v. FERC,*
    766 F.2d 239 (6th Cir. 1985) ...................................... 28

*Lockhart v. United States,*
    546 U.S. 142 (2005) .....................................................33

*Louisville Gas & Elec. Co. v. FERC,*
    988 F.3d 841 (6th Cir. 2021) ....................................... 28

*Mann Constr., Inc. v. United States,*
    27 F.4th 1138 (6th Cir. 2022) ...........................32–33, 36

v

## Table of Authorities

**Court Cases:** PAGE

*Marcello v. Bonds*,
349 U.S. 302 (1955) ...............................................32–33

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021)....................................77

*Midwest ISO Transmission Owners v. FERC*,
373 F.3d 1361 (D.C. Cir. 2004) ..................................... 6

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*
*of Snohomish Cty.*,
554 U.S. 527 (2008) ............................................... 5, 29

*Morrison v. Olson*,
487 U.S. 654 (1988) ................................. 38, 44, 48–50

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut.*
*Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................61

*NLRB v. Bluefield Hosp. Co., LLC*,
821 F.3d 534 (4th Cir. 2016) .......................................31

*New York v. FERC*,
535 U.S. 1 (2002) ........................................................ 6

*N.J. Bd. of Pub. Utils. v. FERC*,
744 F.3d 74 (3d Cir. 2014) ................................. 6–8, 60

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ................................................... 34

*Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*,
28 F.4th 700 (6th Cir. 2022) ........................... 28, 30, 32

*Pub. Serv. Comm'n of N.Y. v. FPC*,
543 F.2d 757 (D.C. Cir. 1974) ...................................... 36

# Table of Authorities

**Court Cases:** PAGE

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001) (en banc) ...................................... 39

*Scott v. First S. Nat'l Bank*,
   936 F.3d 509 (6th Cir. 2019)..................................................... 58

*Se. Mich. Gas Co. v. FERC*,
   133 F.3d 34 (D.C. Cir. 1998)................................................42, 74

*SEC v. Chenery*,
   318 U.S. 80 (1943)..................................................................... 40

*SEC v Chenery*,
   332 U.S. 194 (1947) .............................................................42, 74

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ................................................. 39, 44, 46

*TC Ravenswood, LLC v. FERC*,
   741 F.3d 112 (D.C. Cir. 2013)................................................... 68

*UC Health v. NLRB*,
   803 F.3d 669 (D.C. Cir. 2015) ...................................................31

*United States v. Nixon*,
   418 U.S. 683 (1974)................................................................... 38

*Wis. Valley Improvement v. FERC*,
   236 F.3d 738 (D.C. Cir. 2001)................................................... 68

*Wis. Pub. Power v. FERC*,
   493 F.3d 239 (D.C. Cir. 2007) ...................................................15

*Wrather-Alvarez Broad., Inc. v. FCC*,
   248 F.2d 646 (D.C. Cir. 1957) ...................................................21

*Xcel Energy Servs. Inc. v. FERC*,
   41 F.4th 548 (D.C. Cir. 2022) ................................................... 60

# Table of Authorities

**Administrative Cases:**                                    Page

FERC Order 719,
125 FERC ¶61,071 (2008)............................................................10

FERC Order 831,
157 FERC ¶61,115 (2016)......................................................18, 72

FERC Order 888,
61 Fed. Reg. 21,540 (1996) ....................................................9, 11

*PJM Interconnection, L.L.C.*,
139 FERC ¶61,057 (2012)
**("Order 719 Compliance Order")**................................. 11, 65, 72–73

*PJM Interconnection, L.L.C.*,
171 FERC ¶61,153 (2020)
**("2020 Reserve Market Order")**...............18–19, 51–52, 59, 62, 66

*PJM Interconnection, L.L.C.*,
173 FERC ¶61,123 (2020)
**("2020 Reserve Market Reh'g Order")** ....................... 12, 19, 70–71

*PJM Interconnection, L.L.C.*,
177 FERC ¶61,209 (2021)
**("2021 Remand Order")**................13–14, 24, 51, 53, 55, 57, 61, 63

*PJM Interconnection, L.L.C.*,
180 FERC ¶61,051 (2022)
**("2022 Remand Reh'g Order")**        8–14, 16–19, 24, 31–32
.....................................................35–38, 52–54, 57–61, 63, 65–75

*Rail Splitter Wind Farm, LLC v. Ameren Servs. Co.*,
142 FERC ¶61,047 (2013) .........................................................75

# Table of Authorities

**Statutes:**                                                          **Page**

Administrative Procedure Act

    5 U.S.C. §551 ................................................................33–34

    5 U.S.C. §552 ...................................................................37

    5 U.S.C. §552(f) ...............................................................37

    5 U.S.C. §552b(a)(1) ........................................................37

    5 U.S.C. §559 ...................................................................32

    5 U.S.C. §706(2)(A) .........................................................28

Department of Energy Organization Act

    42 U.S.C. §7171(a) ..........................................................37

    42 U.S.C. §7171(b)(1).............................................23, 37, 47

    42 U.S.C. §7171(c) ...............................29, 31, 38–40, 48

    42 U.S.C. §7171(e) ....................23, 30, 32–33, 37–38, 40

    42 U.S.C. §7171(i)..........................30–31, 36, 38–40, 48

Federal Power Act

    Section 201, 16 U.S.C. §824 ............................................5

    Section 205, 16 U.S.C. §824d ........................................14

    Section 205(a)–(b), 16 U.S.C. §824d(a)–(b) ....................5

    Section 206, 16 U.S.C. §824e ...........................15, 41, 50

    Section 206(a), 16 U.S.C. §824e(a) ...........................5, 15

    Section 313(a), 16 U.S.C. §825*l*(a) .....................19–20, 42

    Section 313(b), 16 U.S.C. §825*l*(b).................. 19–21, 28, 41–42

# Table of Authorities

**Statutes:** **Page**

P.L. 79-404, 60 Stat. 237 (1946) ..........................................................33

P.L. 89-554, 80 Stat. 383 (1966) ..........................................................33

**Regulations:**

18 C.F.R. §35.28(a)(7) .......................................................................... 54

18 C.F.R. §376.103 ................................................................................ 38

**Other Authorities:**

FERC, Energy Primer:
    A Handbook of Energy Market Basics (Apr. 2020) ........ 11

PJM Manual 11, §4.3 (2023) ................................................................ 11

PJM Operating Agreement, Schedule 1, §2.5(a) ....................................13

PJM Operating Agreement, Schedule 1, §2.5.1(a) .................................13

PJM Operating Agreement, Schedule 1, §3.2.1 ..................................... 65

# Glossary

| | |
|---|---|
| 2020 Reserve Market Order | FERC order deeming PJM's Legacy Demand Curve to be unjust and unreasonable and accepting its replacement Revised Demand Curve, *PJM Interconnection, L.L.C.*, 171 FERC ¶61,153 (May 21, 2020), JA659–814 |
| 2020 Reserve Market Reh'g Order | FERC order denying rehearing of the 2020 Reserve Market Order, *PJM Interconnection, L.L.C.*, 173 FERC ¶61,123 (Nov. 3, 2020), JA816–880 |
| 2021 Remand Motion | FERC motion, filed August 13, 2021 in the D.C. Circuit (Nos. 20-1372, *et al.*), seeking voluntary remand of the agency record in the 2020 Reserve Market Order proceeding, JA884–888 |
| 2021 Remand Order | FERC order, on voluntary remand of the agency record, reversing the two 2020 Reserve Market Orders in relevant part and holding that PJM failed to prove that its Legacy Demand Curve is unjust and unreasonable, *PJM Interconnection, L.L.C.*, 177 FERC ¶61,209 (Dec. 22, 2021), JA891–918 |
| 2022 Remand Reh'g Order | FERC order denying rehearing of the 2021 Remand Order, *PJM Interconnection, L.L.C.*, 180 FERC ¶61,051 (July 28, 2022), JA980–1058 |
| A | Addendum |

| | |
|---|---|
| APA | Administrative Procedure Act |
| Br. | Opening brief of Petitioners EPSA and P3 |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| EPSA | Petitioner Electric Power Supply Association |
| Generators | Petitioners Electric Power Supply Association ("EPSA") and PJM Power Providers Group ("P3") |
| Load-serving entity | PJM-member utility that sells electricity to end-use retail customers |
| Market Monitor | The Independent Market Monitor, which is responsible for carrying out market monitoring functions in FERC-approved regional transmission organizations like PJM |
| NERC | North American Electric Reliability Corporation |
| P | Internal paragraph number in a FERC order |
| P3 | Petitioner PJM Power Providers Group |
| PJM capacity auction | Wholesale market designed to ensure adequate electric capacity (i.e., the ability for an electric generator to produce power) to meet projected electric load (i.e., consumer demand) in the future |

| | |
|---|---|
| PJM Interconnection, L.L.C. | FERC-regulated regional transmission organization—termed a "wholesale market operator" herein—for 13 Mid-Atlantic States and the District of Columbia |
| PJM reserve markets | Competitive markets into which electric generators place bids to supply a certain amount of reserve power, if needed |
| Reserve Penalty Factor | The maximum price PJM is willing to pay, within the reserve markets, to satisfy a particular quantity of reserve demand |
| Wholesale market operator | A regional transmission organization that operates the electric transmission system and manages wholesale sales through wholesale markets like the PJM capacity auction |

# In the United States Court of Appeals for the Sixth Circuit

### Nos. 22-3176, 22-3666, 22-3794 & 22-3796
### (consolidated)

————————

ELECTRIC POWER SUPPLY ASSOCIATION, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————————

ON PETITIONS FOR REVIEW
OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————————

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————————

## INTRODUCTION

Various events, such as power plant malfunctions, transmission line outages, and inclement weather, can disrupt the reliable flow of electricity across the Nation's electric grid. Sometimes these exigencies arise with little or no warning. To ensure that consumers enjoy reliable electricity notwithstanding such events, operators of the Nation's several regional electric grids secure electric generation capacity that sits in reserve, ready to be deployed when needed.

PJM Interconnection, L.L.C., operating in 13 Mid-Atlantic States and the District of Columbia, is one of these grid operators. It holds reserve auctions into which electric generators (power plants) bid a certain amount of reserve capacity at a particular price. These markets also include prices, called Reserve Penalty Factors, that reflect the maximum PJM is willing to pay to secure a certain quantity of reserve. The Penalty Factors govern how PJM determines its energy and reserve market clearing prices when it cannot procure sufficient reserves at a price below the Penalty Factor price. As a practical matter, however, the Penalty Factors rarely affect prices because the reserve auctions usually clear at well below the Penalty Factor price.

In 2019, PJM filed a proposal with Respondent Federal Energy Regulatory Commission ("Commission" or "FERC") to, among other things, more than double its highest Reserve Penalty Factor. PJM explained that its current rates might be too low for PJM to procure all reserve market bids necessary to meet its minimum reserve requirements, which could cause PJM to fall short of those requirements. PJM submitted its proposal notwithstanding a lack of direct evidence that its Penalty Factors had caused it to be short of reserves, and even though PJM estimated its reforms would increase consumer costs by half-a-billion dollars each year.

PJM filed its proposal under Section 206 of the Federal Power Act, 16 U.S.C. §824e. That meant PJM had the burden of proving that its existing reserve market rules were "unjust and unreasonable" before FERC could assess whether its proposed replacement rules were, on their own merits, "just and reasonable." The Commission initially agreed with PJM on both inquiries in two orders it issued in May and November 2020. Several parties sought judicial review of those orders in the U.S. Court of Appeals for the D.C. Circuit.

Months later, the Commission decided to reconsider its orders. But by that time FERC had already filed the agency record with the D.C. Circuit, thereby divesting FERC of jurisdiction to modify the 2020 orders. Thus, FERC sought leave of the court for a voluntary remand of the agency record, which the court promptly granted in August 2021. No party opposed the motion, including Petitioners Electric Power Supply Association ("EPSA") and PJM Power Providers Group ("P3") (collectively, the "Generators"), who had intervened in the D.C. Circuit appeals in support of the 2020 orders.

On remand, the Commission changed course. In orders issued in December 2021 and July 2022, FERC decided that PJM had, in fact, failed to prove that its existing reserve market rules were unjust and unreasonable. It

therefore did not reach the second step of the Federal Power Act Section 206 analysis—i.e., a determination whether PJM's replacement rules were just and reasonable.

## STATEMENT OF ISSUES

1. Did the Commission act within its statutory and constitutional authority when its lawyers, at the direction of its Chairman, filed a judicial motion seeking leave of the court—then the D.C. Circuit—to remand the agency record back to the Commission in order to allow for reconsideration of the Commission's earlier orders?

2. Did the Commission reasonably determine that PJM and the Generators failed to prove that PJM's existing reserve market rules were unjust and unreasonable, as they were required to do under Section 206 of the Federal Power Act?

## STATEMENT OF FACTS

### I. Background

#### A. The Federal Power Act

Section 201 of the Federal Power Act, 16 U.S.C. §824, gives the Commission exclusive jurisdiction over the rates, terms, and conditions of service for the transmission and sale at wholesale of electric energy in interstate commerce. *See FERC v. EPSA*, 577 U.S. 260, 264–266 (2016). Under Section 205, §824d(a)–(b), all rates related to the transmission or sale of electric energy, and all related rules and regulations, must be "just and reasonable" and not "undu[ly] preferen[tial]." Under Section 206, §824e(a), if the Commission finds, on its own initiative or upon a third-party complaint, that an existing rate, or a rule, regulation, or practice affecting such rate, is "unjust, unreasonable, unduly discriminatory or preferential," it must set a new just and reasonable rate. *See EPSA*, 577 U.S. at 266. The matter here on review is undisputedly governed by Section 206.

#### B. Overview of wholesale electric power markets

##### 1. The transition to competitive wholesale power markets

Traditionally, wholesale rates for electricity were primarily set on an individualized, cost-of-service basis. *Morgan Stanley Capital Grp. Inc. v.*

*Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 532 (2008). That

changed in 1996 with FERC Order 888 and in 1999 with FERC Order 2000.

*Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363–1364

(D.C. Cir. 2004). Among other things, both orders encouraged transmission

owners to divest control of their transmission facilities and turn over

operations to a regional transmission organization, oftentimes run by an

independent system operator, *id.*—hereafter termed a "wholesale market

operator." Taken together, FERC Orders 888 and 2000 sought to leverage

market forces to promote competition in wholesale sales of electricity. *New*

*York v. FERC*, 535 U.S. 1, 11 (2002); *N.J. Bd. of Pub. Utils. v. FERC*, 744

F.3d 74, 82 (3d Cir. 2014).



*Figure 1:* Wholesale market operators, *available at* https://perma.cc/NZY3-JPQB

### 2. PJM Interconnection, L.L.C. and the provision of power through competitive, wholesale power markets

PJM Interconnection, L.L.C. is one of several wholesale market operators. *See* Figure 1, *supra*. Its footprint is large, covering part or all of 13 States and the District of Columbia. *New Jersey*, 744 F.3d at 82. "One of PJM's primary responsibilities as system operator is to ensure that there is a

sufficient amount of electrical capacity within its system to provide reliable electricity to its consumers during periods of peak demand. 'Capacity' is not electricity itself but the ability to produce it when necessary." *Id.* (cleaned up). Demand for electric energy is termed "load," and local utilities that sell electricity to end-use consumers are deemed, in industry vernacular, "load-serving entities." *Id.*

Like most wholesale market operators, PJM "administer[s] a number of competitive wholesale auctions: for example, a 'same-day auction' for immediate delivery of electricity to [load-serving entities] facing a sudden spike in demand; a 'next-day auction to satisfy [load-serving entities]' anticipated near-term demand; and a 'capacity auction' to ensure the availability of an adequate supply of power at some point"—in the case of PJM, generally three years—"in the future." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016).

### 3. The PJM operating reserve markets

1. Forecasted generation capacity (electricity supply) and load (electricity demand) are estimates, not certainties: There exists the perennial risk that a power plant will malfunction or that load will suddenly spike due to, say, extreme temperatures. *See PJM Interconnection, L.L.C.*,

180 FERC ¶61,051, P 4 (July 28, 2022), JA981–982 ("2022 Remand Reh'g Order").  Such contingencies, should they occur, trigger a need for more generators to dispatch—i.e., to provide energy to the electric grid—than was otherwise predicted.  Thus, wholesale market operators commit a bank of resources to stand ready to supply what is termed operating reserve to the grid at any given time.  *See id.*

PJM, like other wholesale market operators, must offer two types of operating reserve:  "spinning reserve" and "supplemental reserve."  FERC Order 888, 61 Fed. Reg. 21,540, at p.21,582 (1996).  A generator supplying spinning reserve is on-line but selling less than its total output on the energy markets.  It is available to dispatch in an instant.  *Id.*  Supplemental reserve is provided by generating units that can dispatch within a short timeframe— e.g., 10 minutes.  *Id.* at pp.21,582–21,583.  Today, PJM provides these services through three reserve products that it procures on a competitive basis:  Synchronized Reserves (equivalent to spinning reserves); Non-Synchronized Reserves (supplemental reserves that are available within 10 minutes); and Secondary Reserves (supplemental reserves that are available within 30 minutes).  2022 Remand Reh'g Order P 5 n.10, JA982.

Collectively, these reserve services ensure that the wholesale market operator can reliably meet electricity demand on a moment-to-moment basis.

2.  PJM's current reserve market pricing rules have their genesis in FERC Order 719 (issued in 2008), which required market operators to accurately value energy during an operating reserve shortage.  Order 719, 125 FERC ¶61,071, P 15 (2008).  To comply with Order 719, PJM proposed, and the Commission accepted, its current Operating Reserve Demand Curve (hereafter, the "Legacy Demand Curve"), as illustrated by Figure 2, *infra*. *See* 2022 Remand Reh'g Order P 7, JA983–984.



*Figure 2* PJM's Legacy Operating Reserve Demand Curve for Synchronized Reserve, JA29

Each segment of the Legacy Demand Curve represents the maximum price PJM will pay, within the reserve markets, to satisfy a particular quantity of reserve demand, which is represented by the x-axis.  *Id.*  These

prices are called Reserve Penalty Factors. *Id.* Step 1 of the Legacy Demand Curve has been in effect since 2012 (though the $850/MWh[1] rate was phased in over three years), and Steps 2A and 2B were added in 2017 and 2015, respectively. PJM Proposed Revised Demand Curve at 24–25, JA29–30 (Mar. 29, 2019) ("PJM Proposal"); *see also PJM Interconnection, L.L.C.*, 139 FERC ¶61,057, PP 19, 62 (2012) ("Order 719 Compliance Order").

Step 1 of the Legacy Demand Curve reflects the minimum amount of reserve PJM needs to comply with its reliability requirement, which PJM calculates based on the size of its largest single contingency. PJM Proposal, Att. F, ¶7, JA256–257 (Affidavit of Patricio Rocha Garrido); PJM Manual 11, §4.3 (2023), Addendum ("A") 23–27. A "contingency" is a loss of electric generation due to, for example, a malfunctioning power plant. *See* FERC Order 888, 61 Fed. Reg. 21,540, at p.21,582. This largest-single-contingency amount—i.e., the minimum reserve requirement—is based on reliability standards set by the North American Electric Reliability

---

[1]     A megawatt (MW) is a unit of power, whereas a megawatt-hour (MWh) is the amount of electric energy generated, transmitted, or used in an hour. FERC, Energy Primer: A Handbook of Energy Market Basics 35–36 (Apr. 2020), *available at* https://www.ferc.gov/media/2020-energy-primer-handbook-energy-market-basics.

Corporation (NERC).[2]  *See* 2022 Remand Reh'g Order P 4, JA981–982; PJM Proposal, Att. E, ¶21, JA248–249 (Affidavit of Christopher Pilong).  Step 1 is associated with a Reserve Penalty Factor of $850/MWh.  2022 Remand Reh'g Order P 7, JA983–984.

Step 2A adds a 190 MW buffer to the minimum requirement, which can be extended beyond 190 MW if needed, as represented by Step 2B.  *Id.*; *accord PJM Interconnection, L.L.C.*, 173 FERC ¶61,123, P 46 (Nov. 3, 2020), JA835 ("2020 Reserve Market Reh'g Order").  Steps 2A and 2B are associated with a Reserve Penalty Factor of $300/MWh.  2022 Remand Reh'g Order P 7, JA983–984.  Beyond this buffer the Reserve Penalty Factor is $0/MWh.

The Reserve Penalty Factors do not directly set the price for reserve capacity all, or even most, of the time.  PJM acquires reserves through competitive auctions, into which generation resources bid to supply a specified amount of reserve capacity.  *See* 2022 Reserve Market Reh'g Order P 5 & n.10, JA982; PJM Proposal at 23–24, JA28–29; *see also* PJM

_____

[2]      NERC is a non-profit international regulatory authority that develops and enforces electric grid reliability standards, subject to FERC oversight. *See* NERC, "About NERC," *available at* https://www.nerc.com/AboutNERC/Pages/default.aspx.

Operating Agreement, Schedule 1, §§2.5(a), 2.5.1(a), A28–29.  Oftentimes

these resources bid at $0/MWh because their cost of providing reserves is

zero.  *See* 2022 Remand Reh'g Order P 77, JA1033–1035.  Such a scenario

occurs if, for example, PJM dispatches only part of a large natural gas plant's

capacity in the energy markets in real-time.  *See id.*  In that case, the plant is

already running (it is "spinning"), but some or even most of its capacity is

sitting idle—i.e., it can provide reserve power at no additional cost.  *See id.*

The PJM reserve markets often clear at $0/MWh (56.8% and 97.5% of

the time in 2018, depending on the reserve market[3]), meaning PJM will

purchase its minimum reserve requirements at a price of $0/MWh.  *PJM*

*Interconnection, L.L.C.*, 177 FERC ¶61,209, P 41 n.91 (Dec. 22, 2021),

JA910 ("2021 Remand Order").  Relatedly, the record does not demonstrate

PJM's inability to procure reserves sufficient to ensure reliable operations,

and PJM is rarely short of the minimum plus the 190 MW buffer.  2022

Remand Reh'g Order PP 26, 49, JA996–997, 1010; *see also* 2021 Remand

---

[3]     For example, PJM operates a reserve market for resources that are
spinning and can provide energy within 10 minutes of being called-upon by
the PJM operator, and another reserve market for resources that are offline
but are still capable of coming online and providing energy within 10
minutes.  *See* 2022 Remand Reh'g Order P 5, JA982.

Order P 39, JA908–909.  Consistent with these data, the record does not

show that the $850/MWh maximum Reserve Penalty Factor is so low that

PJM has suffered a Step 1-shortage event—i.e., that bid-for reserve capacity

fails to satisfy the minimum reserve requirement because it is available only

at a price above $850/MWh.  *See* 2022 Remand Reh'g Order PP 47–49,

JA1008–1010.

### C.	In March 2019, PJM filed a Federal Power Act Section 206 proposal to replace the Legacy Demand Curve with the Revised Demand Curve

1.  A utility seeking to change its own market rates (including market

rules like the Operating Reserve Demand Curve) typically does so using

Section 205, 16 U.S.C. §824d, of the Federal Power Act.  That procedure is

relatively friendly to the utility filer because the only question on FERC

review is whether the utility's proposed change is just and reasonable.  *See*

*City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984) (Section 205

"is intended for the benefit of the utility").  Given that "reasonableness is a

zone, not a pinpoint," the utility enjoys a degree of latitude in fashioning its

preferred market rules, even if the Commission would develop different rules

in the first instance, and even if the Commission thinks the current rules

already pass muster under the just and reasonable standard. *Cf. Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 266 (D.C. Cir. 2007).

Not so with Federal Power Act Section 206, 16 U.S.C. §824e. Section 206's procedures "'are entirely different and stricter than those of section 205.'" *Int'l Transmission Co. v. FERC*, 988 F.3d 471, 483 (D.C. Cir. 2021) (quoting *Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017)) (cleaned up). "Unlike in a Section 205 proceeding, the proponent of a rate change under Section 206 'bears the burden of proving that the existing rate is unlawful'"—i.e., that the current rate is unjust and unreasonable. *Id.* (quoting *Emera Me.*, 854 F.3d at 24) (cleaned up). Only after clearing this initial hurdle (Step A) will the Commission decide if the replacement rate is, itself, just and reasonable (Step B). *Emera Me.*, 854 F.3d at 24–25.

Section 206 is generally invoked by the Commission or a third-party complainant challenging an existing electric rate or market rule. *See* 16 U.S.C. §824e(a). In its March 2019 proposal to replace the Legacy Demand Curve with a new regime—hereafter termed the "Revised Demand Curve"—PJM was the entity seeking to alter its own rates, and so Section 205, not Section 206, would seem to govern. But PJM's Operating Agreement permits it to file under Section 205 only if a majority of its members—e.g.,

electric power generators, transmission line owners, and load-serving entities—vote to approve the change. *See* 2022 Remand Reh'g Order P 8, JA984. Because PJM failed to secure majority support for the Revised Demand Curve, it was required to file under the more rigorous Section 206.[4] *Id.* That meant PJM was required to prove that its existing market rule—the Legacy Demand Curve—was unjust and unreasonable, not just that its Revised Demand Curve was just and reasonable. *See id.* P 9, JA984–986. This appeal is a dispute over the Commission's ultimate conclusion that PJM failed the first test. It is not about whether PJM's proposed Revised Demand Curve, on its own merits, satisfies the just and reasonable standard.

2. PJM's filing—seeking to implement the Revised Demand Curve— proposed two major changes relevant here: (1) raising the maximum Reserve Penalty Factor from $850/MWh to $2,000/MWh; and (2) replacing the step-wise demand "curve" with a downward sloping curve. *Id.* P 12, JA988; Figure 3, *infra.*

---

[4]    For reasons not relevant here, PJM also submitted a nearly identical filing under Section 205 for purposes of adding its proposed revisions to its governing tariff. *See* 2022 Remand Reh'g Order P 9 & n.20, JA984–986.



*Figure 3* PJM's Proposed Revised Demand Curve, PJM Proposal at 63, 65, JA68, 70 ("PF" means "Penalty Factor" of $2,000/MWh, "MRR" means "minimum reserve requirement," and "PBMRR" means "probability of falling below the MRR").

PJM deemed the revisions necessary for two primary reasons. *First*, it found that the Legacy Demand Curve failed to address market uncertainties around load, wind and solar generation forecasts, and unanticipated generation resource outages. 2022 Remand Reh'g Order P 10, JA986. The result, PJM contended, was that the Legacy Demand Curve caused PJM operators to take two actions: (1) increase—i.e., positively "bias"—load forecasts to signal a need for additional resource capacity that exceeded the Legacy Demand Curve's minimum reserve requirements; and (2) manually purchase reserve capacity outside the reserve market, a practice called an

"out of market action" whereby PJM compensates the resources through a process called "uplift" rather than with market prices. *Id.* P 11 & nn.28, 30, JA986–988.

*Second*, PJM criticized the $850/MWh Reserve Penalty Factor as too low given that, since 2016, the Commission has permitted resources to bid into the energy markets at up to $2,000/MWh if they can verify incurrence of such costs (the prior maximum rate was $1,000/MWh).[5] *Id.* P 10, JA986; *PJM Interconnection, L.L.C.*, 171 FERC ¶61,153, P 34 (May 21, 2020), JA671 ("2020 Reserve Market Order"). Thus, PJM reasoned, if energy prices rise high enough, some resources might lack an incentive to switch from offering energy on the energy markets to standing by to provide reserve power. *See* 2020 Reserve Market Order P 34, JA671. Put another way, PJM predicted that the opportunity cost of providing reserve power necessary to meet PJM's minimum reserve requirement might be greater than the maximum $850/MWh PJM is willing to pay in the reserve markets. *See id.* The opportunity cost in this context is the difference between the prevailing market price for energy and a resource's cost of producing power—i.e., its

_____

[5]    The Commission raised the energy market offer cap in FERC Order 831. *See* Order 831, 157 FERC ¶61,115, P 42 (2016).

foregone net revenues that it would receive on the energy markets. *See* 2022
Remand Reh'g Order P 31, JA998–999. And that scenario, PJM and
Generators surmise, might result in a shortage event—i.e., an inability to
meet minimum reserve requirements at a price no greater than the Reserve
Penalty Factors. *See* PJM Proposal at 28–30, JA33–35.

### D. The Commission's 2020 approval of PJM's proposal

In its initial review of PJM's proposal, the Commission agreed that the
Legacy Demand Curve was unjust and unreasonable and that PJM's
replacement rate—the Revised Demand Curve—was just and reasonable. It
therefore approved the Revised Demand Curve by a 3-1 vote in the 2020
Reserve Market Order (PP 1–2, JA659–660) (with Commissioner Glick
dissenting), and by a 2-1 vote on agency rehearing in the 2020 Reserve
Market Rehearing Order (P 2, JA817) (with Commissioner Glick dissenting).

Several parties sought agency rehearing of the May 2020 Reserve
Market Order within the statutory 30-day deadline. *See id.* P 1, JA816–817;
16 U.S.C. §825*l*(a). The Federal Power Act requires a party to seek rehearing
with FERC as a prerequisite to petitioning for judicial review of a FERC
order. §825*l*(a)–(b); *Entergy Servs., Inc. v. FERC*, 391 F.3d 1240, 1246–1247
(D.C. Cir. 2004). Before FERC acted on the merits of the rehearing

19

applications, parties also filed for judicial review, as they were entitled to do beginning on the 31st day from the date they sought agency rehearing. *See* Petitions, Nos. 20-1372 (D.C. Cir.), *et al.* (filed Sept. 18, 2020); *Allegheny Defense Project v. FERC*, 964 F.3d 1, 13 (D.C. Cir. 2020) (en banc) (interpreting the Natural Gas Act analog to Federal Power Act Section 313(a)–(b), 16 U.S.C. §825*l*(a)–(b)[6]). During this time the Commission retained jurisdiction to "modify or set aside, in whole or in part," the May 2020 Reserve Market Order. §825*l*(a); *accord Allegheny*, 964 F.3d at 16–17. Thus, the durability of the Commission's 2020 Orders was always in doubt.

On June 22, 2021, the Commission filed the certified agency record index with the D.C. Circuit in case Nos. 20-1372, *et al.* Upon doing so the Commission relinquished its power to reconsider the 2020 Reserve Market Orders. While the Commission and court of appeals share concurrent jurisdiction over FERC orders beginning with a timely filed petition for judicial review, the court's jurisdiction "to affirm, modify, or set aside such

---

[6]     It is well-established that "the relevant provisions of the [Federal Power Act and Natural Gas Act] are analogous," meaning "[t]his Court has routinely relied on [Natural Gas Act] cases in determining the scope of the [Federal Power Act], and vice versa." *Hughes*, 578 U.S. at 164 n.10.

order in whole or in part" becomes "exclusive" "upon the filing of the [agency] record" with the court. §825*l*(b); *see also Allegheny*, 964 F.3d at 5.

### E.    The Commission's 2021 motion for voluntary remand

1. It is not uncommon for the Commission to find that its order in a particular proceeding should be modified or set aside, in which case it issues a subsequent order to correct the deficiency. *Cf. Granholm ex rel. Mich. Dep't of Nat. Res. v. FERC*, 180 F.3d 278, 281 (D.C. Cir. 1999) (the statutorily-imposed rehearing requirement affords FERC an opportunity to "correct [the] errors" of an earlier order). But sometimes the Commission arrives at this conclusion after it has already filed the agency record with the reviewing court. In that circumstance, as a matter of both efficient agency practice and judicial economy, the Commission may prefer not to defend orders that the agency itself no longer supports. *Cf. Wrather-Alvarez Broad., Inc. v. FCC*, 248 F.2d 646, 649 (D.C. Cir. 1957) (where the agency might modify a decision, the "proper course" is to "hold the appeal in abeyance pending the Commission's further proceedings, keeping the record open for supplementation to reflect those proceedings"). Thus, the Commission has, from time to time, sought, and received, leave of the court for a remand of the

agency record back to FERC, thereby reinstating FERC's jurisdiction to reconsider its prior orders.[7]

2. The Commission exercised this prerogative in the matter here on review. On August 13, 2021, the Commission filed a motion with the D.C. Circuit to remand the agency record. FERC Motion, Nos. 20-1372, *et al.* (D.C. Cir.) (Aug. 13, 2021), JA884–886 ("2021 Remand Motion"). The primary impetus for the motion was the Commission's new composition. *See* Remand Motion at 2, JA885 ("Further review of the [2020 Reserve Market] orders, under the leadership of a new Chairman, has motivated a reconsideration of the Commission's prior determination."). No party— including the Generators, who had intervened in the D.C. Circuit appeal supporting FERC—opposed the motion, and the court granted it. Order, Nos. 20-1372, *et al.* (D.C. Cir.) (Aug. 23, 2021), JA889–890.

---

[7] *See, e.g.*, *Belmont Mun. Light Dep't v. FERC*, No. 19-1224 (D.C. Cir.) (unopposed motion for voluntary remand granted April 21, 2020); *Xcel Energy Servs. Inc. v. FERC*, No. 18-1005 (D.C. Cir.) (motion granted July 2018); *Petro Star Inc. v. FERC*, No. 18-1104 (D.C. Cir.) (motion granted March 2019); *Cal. Pub. Utils. Comm'n v. FERC*, No. 17-72853 (9th Cir.) (motion granted March 2018); *Madison Gas & Elec. Co. v. FERC*, No. 16-1019 (D.C. Cir.) (motion granted Jan. 2017).

3.  At full strength the Commission has five members, with a maximum of three from the same political party.  42 U.S.C. §7171(b)(1).  (The Commission may conduct business so long as it retains a quorum, which is a minimum of three members.  §7171(e)).  Between issuing the May 2020 Reserve Market Order and filing the August 2021 Remand Motion, the Commission's membership changed several times.  Commissioner McNamee, who comprised one of the three votes for the May 2020 Reserve Market Order, was no longer with the Commission.  Commissioners Clements and Christie (both nominated in July 2020 and confirmed in November 2020) had joined the Commission.  And, in January 2021, President Biden elevated Commissioner Glick—who had dissented from the 2020 Orders—to the FERC Chairmanship.  The upshot is that by August 2021, only two members remained who had voted to approve the 2020 Orders (Commissioners Chatterjee[8] and Danly).

_____

[8]     Commissioner Chatterjee left the Commission soon thereafter, on August 30, 2021.

**F. The Commission's 2021 order reversing its prior approval of PJM's proposal and holding that PJM failed to prove that the current Legacy Demand Curve is unjust and unreasonable**

On December 22, 2021, the Commission issued its Order on Voluntary Remand (the 2021 Remand Order), in which it affirmed certain aspects of the 2020 Reserve Market Orders not at issue here but reversed its prior determination that the Legacy Demand Curve was unjust and unreasonable. 2021 Remand Order P 2, JA891–892; 2022 Remand Reh'g Order P 16, JA989.  After Exelon Generation Company, LLC (now Constellation Energy Generation, LLC) and Petitioners EPSA and P3 sought agency rehearing, the Commission issued an order on July 28, 2022 reaffirming the 2021 Remand Order.  *See* 2022 Remand Reh'g Order P 2, JA980–981.  Chairman Glick and Commissioners Christie and Clements voted for the Remand Orders, which are the orders now on judicial review.  Commissioner Danly dissented.[9]

Notably, PJM—the author of the now-rejected rate proposal—did not seek judicial review of the 2021 and 2022 Remand Orders.  Instead, EPSA, P3, and Constellation filed petitions challenging the Orders in the Sixth,

---

[9]     Then-Commissioner Phillips (nominated September 2021; confirmed November 2021) did not participate in the remand proceeding. Then-Commissioner Phillips is now the FERC Chairman.

Third, and D.C. Circuits, respectively. *See* FERC Motion, No. 22-3176 (6th Cir.), at 5 (filed Mar. 30, 2022). After the Commission supplemented the 2021 Remand Order with additional explanation in the 2022 Remand Rehearing Order, Constellation withdrew its petition from the D.C. Circuit. *See* Order, No. 22-1044 (D.C. Cir.) (Sept. 22, 2022). EPSA and P3, however, pressed on, filing fresh petitions that also included the 2022 Remand Rehearing Order. Their petitions were later consolidated in this Court pursuant to 28 U.S.C. §2112.

## SUMMARY OF ARGUMENT

I. The Generators dispute the authority of Commission lawyers, at the direction of its Chairman, to move the D.C. Circuit for a voluntary remand of the agency record to allow for agency reconsideration of the 2020 Reserve Market Orders. They argue that the 2021 Remand Motion is a Commission "action," and thus the Department of Energy Organization Act ("DOE Act") required the Commissioners to vote on its filing with the D.C. Circuit.

The Generators' argument lacks merit. *First*, the 2021 Remand Motion is not "agency action" as defined by the Administrative Procedure Act ("APA")—i.e., it is not a rule, order, license, sanction, or new source of relief. Once granted by the D.C. Circuit, the Motion served only to allow the

Commission to take another vote to reconsider its earlier orders; the Motion did not modify or undo the 2020 Reserve Market Orders such that it might constitute "agency action" such as a FERC order.

*Second*, the FERC Chairman acted well within his statutory authority to direct the Remand Motion's filing.  The Chairman is responsible for the executive operation of the Commission and the supervision of its personnel.  A quintessential executive function is deciding whether, and how, to litigate a matter, and a classic supervisory function is overseeing and directing subordinates.

*Third*, the Chairman's direction to file the Remand Motion is consistent with the U.S. Constitution.  As a first matter, the Generators' constitutional objection is jurisdictionally forfeited for failure to raise it in their rehearing application with FERC.  The objection fails in any event:  The President may remove the Chairman title from a sitting Commissioner at will, as opposed to only for-cause.  Thus, the Generators' cited caselaw rejecting executive authority exercised unilaterally by an agency head who is removable only for-cause is inapposite.

II.  The Commission acted well within its broad discretion in holding that PJM and the Generators failed to prove that the Legacy Demand Curve is

unjust and unreasonable under Federal Power Act Section 206. *First*, the Commission reasonably found a lack of record evidence that the $850/MWh Reserve Penalty Factor had been, or might be, too low to ensure adequate within-market purchases of reserve capacity. *Second*, the Commission reasonably explained that projections of increased *energy* demand are a poor proxy for evidence of actual increases in *reserve* demand—which evidence is absent from the agency record. *Third*, the Commission's conclusion that out-of-market uplift payments result from factors other than the Legacy Demand Curve is grounded in substantial record evidence. *Fourth*, the Commission reasonably found that PJM and the Generators failed to prove that a step-wise, as opposed to a sloped, Legacy Demand Curve is unjust and unreasonable. *Fifth*, the Commission reasonably found that a hypothetical future, in which opportunity costs for reserve power *might*, and then only *rarely*, exceed $850/MWh, does not render PJM's existing reserve market rules unlawful. And *sixth*, the Commission correctly found that it was not limited in addressing the merits of PJM's proposed Revised Demand Curve on remand from the D.C. Circuit.

**ARGUMENT**

## I.    Standard of review

Questions of law, including disputed constitutional issues and the Commission's interpretation of statutes, are reviewed *de novo*. *Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021); *J.L. Spoons, Inc. v. Dragani*, 538 F.3d 379, 382 (6th Cir. 2008). However, the Commission receives *Chevron* deference for its reasonable interpretation of ambiguous provisions of statutes it administers. *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 718 (6th Cir. 2022).

Commission orders are subject to the deferential substantial evidence and arbitrary and capricious standards of review. *FERC v. EPSA*, 577 U.S. at 292; *Ky. Utils. Co. v. FERC*, 766 F.2d 239, 241–242 (6th Cir. 1985) (citing 16 U.S.C. §825*l*(b)). "[T]he threshold for … evidentiary sufficiency is not high …. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

Relatedly, the Court's arbitrary and capricious review, which derives from APA Section 706(2)(A), 5 U.S.C. §706(2)(A), is "extremely narrow." *Oakbrook*, 28 F.4th at 709, 720 (cleaned up). This is particularly true in

28

cases, like this one, that involve "a technical area like electricity rate design," meaning the Court "'afford[s] great deference to the Commission in its rate decisions.'" *FERC v. EPSA*, 577 U.S. at 292 (quoting *Morgan Stanley*, 554 U.S. at 532). "[T]he court must uphold a [decision] if [FERC] has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up).

## II.  The Commission, through its attorneys and at the direction of its Chairman, appropriately filed the 2021 Remand Motion to allow the agency to reconsider its 2020 Reserve Market Orders

Congress established the Commission and the FERC Chairman's particular powers and responsibilities in two subsections of the 1977 DOE Act.[10]  Section 7171(c) provides that "[t]he Chairman shall be responsible on behalf of the Commission for the executive and administrative operation of the Commission, including functions of the Commission with respect to … (3) the supervision of personnel employed by or assigned to the Commission[.]"  42 U.S.C. §7171(c).  In addition, "attorneys designated by the Chairman of the Commission may appear for, and represent the

---

[10]     Prior to the DOE Act's enactment, FERC's predecessor agency, the Federal Power Commission, implemented the Federal Power Act.

Commission in, any civil action" filed against the Commission, except in the Supreme Court. §7171(i). Elsewhere, the DOE Act disperses power among the several Commissioners, requiring, for instance, that "[a]ctions of the Commission shall be determined by a majority vote of the members"—i.e., Commissioners—"present." §7171(e).

Contrary to the Generators' assertions, the 2021 Remand Motion is not a Commission "action," and so was not subject to a majority vote of FERC's Commissioners. *See* Br. 23, 26-27. Further, the DOE Act concentrates executive and administrative power in the Chairman; directing the filing of the Remand Motion is a quintessential exercise of such authority. And because the President may remove the Chairman from the Chairmanship at will, the Chairman's exercise of these powers is consistent with the U.S. Constitution. Accordingly, the Chairman lawfully directed agency lawyers within FERC's Office of General Counsel to file the 2021 Remand Motion with the D.C. Circuit.

## A. The Commission's filing of the 2021 Remand Motion is consistent with its statutory authority under the DOE Act

### 1. The Commission's interpretation of the DOE Act is entitled to *Chevron* deference

The DOE Act does not speak "precise[ly]" to "the precise question" of the FERC Chairman's authority to direct litigation filings. *See Oakbrook*, 28

F.4th at 718 (cleaned up) (discussing applicability of *Chevron* deference). In light of that ambiguity, the Commission's reasonable interpretation of the Act as vesting the Chairman with power to direct the filing of the Remand Motion is entitled to deference. *Id.*; *see also NLRB v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541–542 (4th Cir. 2016) (*Chevron* deference applied to agency's interpretation of a statute addressing the powers of agency personnel); *UC Health v. NLRB*, 803 F.3d 669, 673–675 (D.C. Cir. 2015) (similar).

In the 2022 Remand Rehearing Order, the Commission reasonably concluded that the DOE Act vests in the Chairman power to "direct[] litigation on behalf of the Commission," including the filing of the 2021 Remand Motion. 2022 Remand Reh'g Order PP 105–107, JA1054–1056. Grounding its analysis in the statute's text, the Commission found that the Chairman's exclusive powers over "'the executive and administrative operation of the Commission,'" and his power to designate attorneys who "'may appear for, and represent the Commission'" in litigation, reasonably cover directing attorneys in the FERC Office of General Counsel to file a motion seeking judicial leave to reassert control over the agency record. *Id.* PP 105, 107, JA1054–1056 (quoting §7171(c), (i)).

The Commission's interpretation of the Chairman's powers easily coexists with the DOE Act's requirement that FERC "actions" be subject to a majority vote of the FERC Commissioners. *See id.* P 107 & n.329, JA1055–1056 (citing §7171(e)). A Commission "action," FERC explained, is best understood to mean "act[s] on substantive matters assigned to [FERC] by statute," not litigation pleadings like the Remand Motion. *Id.* P 107, JA1055–1056. Because the Commission is entrusted with administering the DOE Act, the Court should defer to its reasonable statutory construction. *Oakbrook*, 28 F.4th at 718.

## 2. The APA's definition of "agency action" does not cover the 2021 Remand Motion

1. Even if the Court were to withhold deference, the Commission's reading of the DOE Act is the best one. The inquiry begins with the APA. Under Section 559 of the APA, a "[s]ubsequent statute may not be held to supersede or modify this subchapter … except to the extent that it does so *expressly*." 5 U.S.C. §559 (emphasis added). Thus, " '[e]xemptions from the terms of the [APA] are not lightly to be presumed.' " *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1144 (6th Cir. 2022) (quoting *Marcello v. Bonds*, 349 U.S. 302, 310 (1955)). While Congress need not " 'employ

32

magical passwords'" to override the APA's provisions, *id.* at 1144–1145 (quoting *Marcello*, 349 U.S. at 310), it must be "'clear' or 'plain'" in doing so, *id.* at 1146 (quoting *Lockhart v. United States*, 546 U.S. 142, 145–146 (2005)).

The APA was enacted in 1946, meaning the DOE Act of 1977 is a "subsequent statute." *See* P.L. 79-404, 60 Stat. 237 (1946), *codified at* 5 U.S.C. §551, *et seq.* Because the "subchapter" that includes Section 559 defines "agency action" exclusive of litigation filings, and given that the later-enacted DOE Act does not "expressly" displace the APA's definition, the Commission's August 2021 Remand Motion was not a Commission "action" that the law requires "shall be determined by a majority vote of the [FERC Commissioners]." *Cf.* 42 U.S.C. §7171(e).

2. Section 551—part of the APA "subchapter" covered by Section 559—provides that the term "'agency action' includes the whole or a part of an agency [1] rule, [2] order, [3] license, [4] sanction, [5] relief, or the equivalent or denial thereof, or failure to act[.]"[11]  5 U.S.C. §551(13).  The

---

[11]     The current definition of "agency action" has been in effect since at least 1966—i.e., it predates the DOE Act.  *See* P.L. 89-554, 80 Stat. 383 (1966).

five listed items share a common feature:  They are all "decisions made or outcomes implemented by an agency."[12]  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  The 2021 Remand Motion, by contrast, is a *request* for a decision to be made by a *court*; it is not a "*decision*[] made … by [the] agency*."  *Cf. id.* (emphasis added).

Nor is the 2021 Remand Motion the "equivalent" of a rule, order, license, sanction, or relief.  *See Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868, 877 (11th Cir. 2009) ("The phrase 'or the equivalent' must be read cautiously because any agency step that is the 'equivalent' of a narrow included term must also be narrow." (quoting §551(13), and citing *S. Utah*, 542 U.S. at 62)).  The Generators suggest otherwise, contending that the Remand Motion is tantamount to a standard-issue, majority-voted order because it "alter[ed] [the] preexisting order," "und[id] a prior decision," "over[rode] a majority-enacted Commission order," and sought to enlist the D.C. Circuit in "us[ing] its Article III power to undo a valid Commission order[.]"  Br. 24, 28, 39.  But the Remand Motion did none of these things.  It did not disturb the 2020 Reserve Market Orders (which remained in effect

---

[12]    For example, an "order" is "a final disposition … in a matter other than rule making but including licensing."  §551(6).

until the Commission issued the 2021 Remand Order[13]) nor did it ask the

D.C. Circuit to "undo" them.  It simply sought leave of the court to remand

the agency record, thereby allowing the Commission an opportunity to

"modify or set aside, in whole or in part" the 2020 Reserve Market Orders.

*See Allegheny*, 964 F.3d at 16–17.  As the Remand Motion explained, further

review of the 2020 Orders, under the leadership of a new Chairman and with

a changed Commission composition, "motivated a reconsideration of the

Commission's prior determination."  *See* 2021 Remand Motion at 2, JA885;

*see supra* p.22.  The Commission only "undid" the 2020 Orders when it later

issued the majority-voted 2021 Remand Order.[14]

The cases cited by the Generators lend support only to their fictive

characterization of the Remand Motion.  *Public Service Commission of N.Y. v.*

---

[13]     The effective date of PJM's Revised Demand Curve was May 1, 2022.
Because the Commission reversed its approval of PJM's proposal in
December 2021, the Revised Demand Curve never took effect,
notwithstanding that the tariff language adopting the revision remained on
file.  *See* 2022 Remand Reh'g Order P 14, JA989.

[14]     The Generators' quibble with an additional stated ground for filing the
2021 Remand Motion—revisiting application of a 10% rate adder (Br. 29 &
n.6)—is puzzling, given that the Commission *did* eliminate the 10% adder in
an order issued after it filed the Remand Motion.  *See* 2022 Remand Reh'g
Order P 96, JA1048.

*FPC* stands for the unremarkable proposition that FERC may change a prior order only by issuing a new, majority-voted one; Commissioners may not vitiate an already-issued order by seeking to retroactively change their votes *on* the already-issued order.  543 F.2d 757, 774–778 (D.C. Cir. 1974).  And *Hirschey v. FERC* explains that FERC may not change an order if the agency record is already filed with the reviewing court.  701 F.2d 215, 218 (D.C. Cir. 1983).  Neither case casts any doubt on the Chairman's power to direct the filing of a litigation motion seeking a judicial remand.

### 3.    The DOE Act does not displace the APA's definition of "agency action"

The next step is to determine whether, notwithstanding the APA's definition of "agency action," the DOE Act "clear[ly] or plain[ly]" supplants it.  *See Mann Constr.*, 27 F.4th at 1144–1145 (cleaned up).

It does not.  Fairly read, the DOE Act expresses Congress' intent for Commission action under that statute to mean "agency action" under the APA.  The Act provides that "the Commission shall be deemed to be an *agency*" "[f]or the purpose of [5 U.S.C. §]552b."  42 U.S.C. §7171(i) (emphasis added).  Section 552b, in turn, states that "the term 'agency' means any agency as defined in section 552[(f)] of this title, headed by a

collegial body composed of two of more individual members," §552b(a)(1), including "any independent regulatory agency," §552(f).[15] FERC is "an independent regulatory commission." *See* 42 U.S.C. §7171(a)–(b). Thus, the DOE Act's term "action of the Commission" (§7171(e)) plainly means "action of the agency." Tellingly, the Generators offer no definition of the term to guide the inquiry, nor does the DOE Act provide an alternate definition.

Even were all this not sufficient to dispatch the Generators' claim that the Remand Motion *is* agency action, their own argument suffers from an internal conflict. They contend that because, in their view, the Remand Motion is agency action, it was subject to *either* internal polling *or* a majority vote of the Commissioners. *See* Br. 26–27, 29. True, "a tradition has developed of the Chairman 'polling' fellow Commissioners on staff recommendations with regard to certain litigation decisions." *See* 2022 Remand Reh'g Order P 107 n.329, JA1055. But the Generators nowhere make the claim—much less substantiate it—that polling is equivalent to a

---

[15] Section 552b cross-references Section 552(e), not 552(f), but "Section 552(e) … was redesignated section 552(f) … by section 1802(b) of Pub. L. 99-570." *See* §552, "Editorial Notes," A6.

formal majority vote by the Commissioners.  That matters because if the Remand Motion is an "action of the Commission," as the Generators insist it is (Br. 26–27), then the DOE Act required that it be put to "a majority *vote* of the [Commissioners] present."  §7171(e) (emphasis added).  The Generators' suggestion that internal "polling" would suffice flunks their own test.

### 4. The Chairman's direction to agency lawyers to file the 2021 Remand Motion falls comfortably within his executive and administrative powers

1.  The remaining statutory question is whether the Chairman acted within his authority in directing the filing of the 2021 Remand Motion.  The Commission reasonably deemed the answer to be "yes."  *See* 2022 Remand Reh'g Order PP 105–107, JA1054–1056 (citing 42 U.S.C. §7171(c), (i)).  *First*, the Chairman is responsible for the "executive … operation of the Commission" and is its "chief executive officer."  §7171(c); 18 C.F.R. §376.103.  Deciding how and "whether to prosecute a case" is an inherently executive function.  *See United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also Morrison v. Olson*, 487 U.S. 654, 692 (1988) ("There is no real dispute that [law enforcement] functions … are 'executive[.]'").  Indeed, it is the "special province of the Executive Branch" to decide whether "to institute proceedings," including "through civil … process[es]."  *Heckler v. Chaney*,

470 U.S. 821, 831–832 (1985); *see also Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 756 (5th Cir. 2001) (en banc) (the "Executive power" includes litigating civil actions). And "[a]lthough FERC," as an independent regulatory agency, "is substantially independent of the Executive, it nonetheless performs executive functions." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 472 (D.C. Cir. 1982). Thus, in locating executive power in the Chairman, the DOE Act reasonably vests him with authority over litigation decisions that are not otherwise "action[s] of the Commission" requiring a majority vote. *See* §7171(c).

*Second*, and relatedly, the Chairman is responsible for "the supervision of [Commission] personnel," *id.*, which itself is an executive function, *see Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020). And Congress made the Chairman's supervisory power specific with respect to litigation proceedings: It granted the Chairman sole discretion to "designate[]" the attorneys who "may appear for, and represent the Commission in, any civil action …." §7171(i). This language reinforces both the Chairman's supervisory authority over Commission staff and his executive power to direct that staff in litigation matters.

2.  None of this is to say that the Chairman's power to direct FERC litigation is unbounded.  Recall that an "[a]ction[] of the Commission" is decided by a majority vote of the Commissioners.  §7171(e).  Because the Chairman must act "on behalf of the Commission," §7171(c), and because FERC attorneys may only "represent the Commission," §7171(i), the Chairman reasonably may not direct FERC attorneys to advance a litigation position contrary to an "[a]ction[] of the Commission"—e.g., by defending the dissenting view in a majority-voted order.  *Cf. SEC v. Chenery*, 318 U.S. 80, 87 (1943) (agency's defense of its action on judicial review must cohere with its administrative decision for a court to credit it).  But the Chairman does not cross that line by exercising his prerogative to direct a litigation motion that allows the full Commission an opportunity to revisit its past decision.

> ### 5.  The Generators are wrong that the Commission may change its 2020 Reserve Market Orders only by using Federal Power Act Section 206

Unable to wedge the 2021 Remand Motion into the definition of "action of the Commission," the Generators switch gears and argue that, irrespective of who directed the Remand Motion, it was unlawful for the Commission to file it in any event.  Br. 31.  The Generators reason that "the

Commission" is "generally barred from simply reopening and modifying its own orders." *Id.* Instead, they argue, FERC could have revised its 2020 Reserve Market Orders by one of two avenues only: (1) on remand from a judicial decision rejecting the Orders as unlawful, or (2) by opening a Federal Power Act Section 206, 16 U.S.C. §824e, proceeding. *Id.* at 30–31, 42. Recall that Section 206 empowers the Commission to set a new just and reasonable rate only if it first determines that an existing rate is unjust and unreasonable. *See supra* pp.14–15.

The Generators' argument is jurisdictionally forfeited for failure to raise it in their rehearing application. *E.g.*, *Entergy*, 391 F.3d at 1246–1247 ("'No objection to [an] order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.'" (quoting 16 U.S.C. §825*l*(b)). At most, the Generators alleged on rehearing that following Section 206 procedures, rather than seeking voluntary remand, would have a less "de-stabilizing effect"; nowhere did they argue that FERC was required to take the Section 206 route. *See* Generators' Reh'g Application at 11, JA955 (Jan. 21, 2022); *see also Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) ("Petitioners must

raise each argument with specificity; objections may not be preserved either indirectly or implicitly." (cleaned up)).

Anyhow, the Generators' argument is meritless. The Generators acknowledge that the D.C. Circuit's August 2021 order granting FERC's Remand Motion, once issued, vested FERC with the power to modify its orders without opening a Section 206 proceeding. *See* Br. 32 ("*Absent the unlawfully requested remand*, the Commission would have had no power to simply alter its order without following the procedures of Section 206." (emphasis added)); Br. 33–34 (the "unlawful remand request" allowed FERC to apply a "more lenient substantive standard" in modifying the 2020 Orders). Indeed, "[o]nce FERC reacquire[s] jurisdiction" after a judicial remand, "it ha[s] the discretion to reconsider the whole of its original decision," *Se. Mich. Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C. Cir. 1998)—i.e., by revisiting and modifying its prior orders just as it may do *before* it files the record with the court, *see* 16 U.S.C. §825*l*(a)-(b); *see also SEC v. Chenery*, 332 U.S. 194, 201 (1947) (upon judicial remand, the agency "deal[s] with the problem *afresh*, performing the function delegated to it by Congress" (emphasis added)). Thus, properly framed, the Generators' challenge to FERC's process for reviewing the 2020 Reserve Market Orders on remand is

really a tardy and precluded collateral attack on the D.C. Circuit's 18-month-old order *granting* remand.

Nor can the Generators plausibly claim prejudice from the D.C. Circuit's order given that they did not oppose the Remand Motion. It is no answer for the Generators to complain that they "did not *know*" at the time of FERC's filing "that the motion did not represent" a majority-voted decision of the Commissioners, and so did not contest it. *See* Br. 29. If, as the Generators allege, the Remand Motion was an unlawful attempt to circumvent Section 206, then their ignorance of the Motion's provenance is irrelevant to their decision not to contest it.

At any rate, the Generators fail to substantiate their suggestion that the D.C. Circuit's remand order was unlawful in the first place. *Cf.* Br. 33–34 (alleging that Congress selected Section 206 as the sole vehicle for modifying the 2020 Orders). That is unsurprising given that the Commission has sought—and received—voluntary remands many times over the years, without any judicial finding that such relief is beyond a court's power to grant. *See supra* p.22 n.7 (listing prior voluntary remands). Nor does voluntary remand undermine the force and effect of Section 206: The Commission acknowledges that it would be required to use the Section 206

procedure to modify an existing order where the order is final and not subject to pending judicial review.

### B. The Chairman's direction to file the 2021 Remand Motion is consistent with the U.S. Constitution

Finding no footing in the DOE Act or Federal Power Act, the Generators up the ante, dramatizing the 2021 Remand Motion as "cast[ing] FERC into storm[y] seas" and setting FERC on a collision course with the U.S. Constitution.  Br. 38.  The Generators begin with the premise that the President may remove the FERC Chairman from the Commission only for-cause.  *See* Br. 36–37.  That limitation on the President's removal power means, according to the Generators, that the Chairman may exercise only "'ministerial' functions," Br. 39 (quoting *Morrison*, 487 U.S. at 6[8]1), rather than the "'core executive power'" generally enjoyed by officers whom the President may remove at will, Br. 36, 38 (quoting *Seila Law*, 140 S. Ct. at 2200).  Directing the filing of a litigation motion is, the Generators allege, a "core executive power."  Br. 38.  Accordingly, the Generators urge the Court to apply the constitutional avoidance canon by declining to interpret the DOE Act to confer upon the Chairman power to file the Remand Motion.  Br. 35–36.

The Generators' argument fails on three independent grounds. *First*, the Generators did not advance any constitutional objection to the Chairman's action in their rehearing application with the Commission; the objection is therefore jurisdictionally forfeited. *Entergy*, 391 F.3d at 1246–1247; *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 115 (D.C. Cir. 2022) (under the Natural Gas Act analog to 16 U.S.C. §825*l*, constitutional objections must be raised before FERC in a rehearing application to preserve them for judicial review). *Cf. Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 676–678 (6th Cir. 2018) (pursuant to an analogous statutory scheme, explaining that failure to press "as-applied or constitutional-avoidance challenges before the [Federal Mine Safety and Health Review] Commission" constituted forfeiture in the court of appeals, but excusing forfeiture there because Sixth Circuit law was not, before *Jones Brothers*, clear).

*Second*, on the merits the Generators' constitutional claim misapprehends the Commission's structure: The President may strip the Chairman of his title—and with it all the powers that inhere in the office of the Chairman—not merely for-cause, but at will. *Third*, neither the Constitution nor case law limits the Chairman to performing mere ministerial duties.

1.  The Constitution does not speak expressly to the President's removal power, but the Supreme Court has deemed it inherent in Article II's vesting of "'[t]he executive Power ... in a President.'"  *Seila Law*, 140 S. Ct. at 2197 (quoting U.S. Const., art. II, §1, cl. 1); *id*. at 2226 (Kagan, J., dissenting).  *Seila Law* explains that the power to remove officials ensures that the President may hold "lesser officers"—who themselves perform executive functions—accountable to him, thus preserving the President as the locus of the executive power.  *See id*. at 2197.

Nearly 90 years ago the Supreme Court upheld Congress' authority to allow the President to remove Commissioners of an independent multimember agency only for-cause.  *See Humphrey's Executor v. United States*, 295 U.S. 602, 619–620, 631–632 (1935).  In *Seila Law*, the Court held that the same Congressional prerogative did not apply to the head of a single-member agency who exercised "core executive power" alone.  140 S. Ct. at 2200–2201, 2204.  The Court deemed for-cause removal under those circumstances to be incompatible with Article II's vesting of the "'[t]he executive Power ... in a President.'"  *Id*. at 2197, 2203–2204 (quoting U.S. Const. art. II, §1, cl. 1).

2. The Generators argue that, in unilaterally directing the filing of the Remand Motion, the FERC Chairman alone exercised a "core executive power" that renders his action unconstitutional under *Seila Law*. Br. 38. *Seila Law*, however, is inapposite. The lone Director of the Consumer Financial Protection Bureau in that case was removable only for-cause; the President may remove a FERC Commissioner from the role of Chairman *at will*.

The DOE Act makes this Presidential power plain. It provides that "[t]he Commission shall be composed of five members appointed by the President," that "[m]embers … may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office" (i.e., for-cause), and that "[o]ne of the members shall be designated by the President as Chairman." 42 U.S.C. §7171(b)(1). In other words, a Commissioner may be removed from the Commission only for-cause. But nowhere does the statute restrict the President's power to name a new Chairman, meaning it also does not diminish the President's power to remove a current Chairman at will.

Crucially, once the President strips the Chairman of his title, that individual loses the powers that are concentrated solely *in* the Chairmanship—e.g., the power to, among other things, direct litigation

actions that the Generators contest here.  *See* §7171(c), (i).  The Generators

do not dispute that the powers exclusive to the Chairman inhere in the

position, not in the individual occupying it.  Nor do they cite any caselaw

casting doubt on an agency head's prerogative to exercise executive powers

where that individual, like the FERC Chairman, is removable at will.  And

lest there be doubt, this is not an academic point:  The President exercised

this at-will removal power twice in the last three years.  In November 2020,

President Trump removed then-Chairman Chatterjee and elevated

then-Commissioner Danly to the position.  With the change in administration

soon thereafter, President Biden replaced Chairman Danly with Chairman

Glick in January 2021—all through at-will exercises of authority.

3.  The Generators also err in seeking to confine the Chairman to

non-executive duties.  Br. 38–39.  Their reasoning goes like this:  Under the

Supreme Court's decision in *Morrison v. Olson*, an executive officer who is

removable only for-cause is limited to exercising "'essentially ministerial'

functions."  Br. 39 (quoting *Morrison*, 487 U.S. at 6[8]1).  And because, in

the Generators' view, the Chairman's instruction to file the Remand Motion

"is in no way 'ministerial,'" Chairman Glick exceeded his authority in

directing FERC attorneys to do so.  *Id.*

Not so.  As a first matter, *Morrison* concerned an officer who was removable only for-cause, so that decision, like *Seila Law*, is a poor fit here. *See Morrison*, 487 U.S. at 685, 691–692.  But even were *Morrison* pertinent, the decision does not say what the Generators assert it does.  The Generators claim that *Morrison* upheld "exercises of *'essentially ministerial'* functions exercised by officers *'with limited jurisdiction and tenure and lacking policymaking or significant administrative authority*.'"  Br. 39 (emphasis added) (quoting *Morrison*, 487 U.S. at [681], 691).  But that is wrong. *Morrison*'s discussion of "essentially ministerial" powers does not pertain to the officer implicated there (the for-cause removable independent counsel) *at all.  Morrison* references "ministerial" duties just once, and in the context of something different:  deciding whether the judiciary trammels on the Executive Branch by exercising more than a ministerial role in supervising an executive officer (the independent counsel).  487 U.S. at 681.  And while the second italicized phrase above *does* pertain to the independent counsel position, it is sourced from an entirely different section of the opinion—the section discussing whether Congress could limit the independent counsel's removability only for-cause.  *See id.* at 691–692.

In fact, when it came to describing the independent counsel's authority, the Court explained that the position was vested with substantive "executive" power—e.g., "all investigative and prosecutorial functions and powers of the Department of Justice[.]" *Id.* at 662, 691 (cleaned up). The Court ultimately upheld the for-cause removability of the independent counsel. *Id.* at 691–693. In short, *Morrison* does nothing to undercut the FERC Chairman's power to engage in executive functions such as directing the filing of the 2021 Remand Motion.

## III. The Commission reasonably found that PJM failed to meet its statutory burden of proving that the Legacy Demand Curve is unjust and unreasonable

Federal Power Act Section 206, 16 U.S.C. §824e, places the burden squarely on PJM and the Generators to "'prov[e] that the existing rate'"— the Legacy Demand Curve—"'is unlawful'" because it is "unjust and unreasonable." *Int'l Transmission*, 988 F.3d at 483, 485 (quoting *Emera Me.*, 854 F.3d at 24) (cleaned up); *see supra* pp.14–16. Only upon satisfaction of this initial step (Step A) will the Commission decide if the new rate is, itself, "just and reasonable" (Step B). *Emera Me.*, 854 F.3d at 24–25.

In the 2020 Reserve Market Orders, the Commission found that, under Section 206, the Legacy Demand Curve was unjust and unreasonable, and

that PJM's proposed replacement rate—the Revised Demand Curve—was just and reasonable. *See* 2020 Reserve Market Order PP 74, 97, 153, JA687, 695, 719. On remand of the agency record, the Commission reversed the first of these findings, holding that PJM had, in fact, failed to prove that the Legacy Demand Curve was unjust and unreasonable. 2021 Remand Order P 2, JA891–892. Whether the Revised Demand Curve is, on its own terms, a lawful rate is therefore irrelevant; the Commission could have reached that question only if PJM satisfied its burden of first proving that the Legacy Demand Curve was unjust and unreasonable.

The Generators launch a multi-pronged attack on the Remand Orders. Their various theories, however, misapprehend the applicable legal standard, draw unreasoned inferences from the record evidence, and fail to refute the Commission's reasoned, record-based analysis.

## A. The record shows that an $850/MWh Reserve Penalty Factor attracts sufficient reserve capacity

The Generators assert (Br. 55) that, just as the Commission found in the pre-remand 2020 Reserve Market Orders, the higher 2016-enacted $2,000/MWh energy market offer cap (up from $1,000/MWh) renders the existing $850/MWh maximum Reserve Penalty Factor unjust and

unreasonable.  *See* 2020 Reserve Market Order PP 34, 122, JA671, 705.

They reason that generation resources that are needed to provide reserves

might not enter the reserve markets given the higher rates (up to

$2,000/MWh) they can receive on the energy markets.  *See* Br. 55 & Exh. A,

¶8 (Declaration of Todd A. Snitchler).

    1.  The Generators' argument assumes what it must prove:  that the

Reserve Penalty Factors associated with the Legacy Demand Curve

($850/MWh for Step 1 and $300/MWh for Step 2A) are too low to attract

adequate reserves given the higher energy market offer cap.  As the

Commission explained on remand, PJM has proffered no evidence that

"$850/MWh Reserve Penalty Factors [are] insufficient to procure needed

reserves" within the reserve markets.  2022 Remand Reh'g Order P 71,

JA1029–1030.

    True, PJM submitted data showing that some resources' opportunity

costs[16] of providing reserve power exceeded $850/MWh—indeed, exceeded

$1,000/MWh—on 3.6% of days (70 of 1,947) from January 2014 through

---

[16]    A resource's opportunity cost is the difference between the prevailing
market price for energy and a resource's cost of producing power—i.e., its
foregone net revenues that it would receive on the energy markets.  *See supra*
pp.18–19.

April 2019.  *Id.* PP 32, 51, JA999, 1011–1013.  Thus, 3.6% of the time at least one generator offered reserve capacity at more than the maximum PJM would pay under the Legacy Demand Curve.  *See id.*  But that statistic says nothing about whether PJM needed to *accept* those offers to satisfy its reserve requirements.  *Id.*  If PJM can continue to procure adequate reserves from resources with opportunity costs of $850/MWh or less, then resources' higher-than-$850/MWh offers do not show that the $850/MWh Reserve Penalty Factor is unjust and unreasonable.  *See id.* P 51, JA1011–1013.

2.  Further, the record points affirmatively to the adequacy of the current Reserve Penalty Factors.  For instance, the Penalty Factors do not set the price PJM pays for reserve capacity most of the time.  In fact, the reserve markets usually clear at a price that is 100% *less*:  $0/MWh.  2021 Remand Order P 41 n.91, JA910.

a.  A proliferation of zero-dollar clearing prices is material to the inquiry because it demonstrates the disconnect between the Generators' hypothetical concerns of reserve shortages and actual data.  Some preliminary table setting is in order.  A clearing price reflects the price at the intersection of the supply curve and the Legacy Demand Curve.  If resources sufficient to meet PJM's minimum reserve requirement, plus a 190 MW

53

buffer, bid into the market at $0/MWh, then the clearing price is $0/MWh

and PJM will commit $0-bidding reserve resources up through Step 2A of the

Demand Curve (Scenario 1).  *See* 2022 Remand Reh'g Order P 77 & n.234,

JA1033–1035; Figure 4, *infra*.  *Cf.* Market Monitor[17] Protest at 44–45,

JA312–313 (May 16, 2019).



*Figure 4* $0/MWh clearing price

Now say the reserve auction clears at a price of $200/MWh (Scenario

2).  In that case, the supply and demand curves intersect at the vertical line

bookending Step 2A.  *See* Figure 5, *infra*.  All resources that offer reserves at

a price no more than $200/MWh will receive the clearing price ($200/MWh)

---

[17]     The Independent Market Monitor is responsible for carrying out market
monitoring functions in regional transmission organizations like PJM.  *See*
18 C.F.R. §35.28(a)(7).

for their committed reserve capacity, and PJM will purchase reserves corresponding to Steps 1 and 2A.



*Figure 5* $200/MWh clearing price

Or, if the clearing price is $800/MWh (Scenario 3), then the supply and demand curves intersect at the vertical line bookending Step 1, all resources that offer reserves at a price no more than $800/MWh will receive the clearing price of $800/MWh, and PJM will purchase reserves to satisfy only Step 1 (i.e., the minimum reserve requirement).  *See* Figure 6, *infra*.  *Cf.* 2021 Remand Order P 37, JA907 (explaining that PJM purchases reserves based on the reserve requirements and Reserve Penalty Factors established by its reserve demand curves).



*Figure 6* $800/MWh clearing price

Finally, say the marginal MWh of reserve capacity needed to satisfy Step 1 demand is $900/MWh (Scenario 4). In that event, the supply curve intersects with the demand curve at a point before the minimum reserve requirement (Step 1) is met, triggering a reserve shortage event. *See* PJM Proposal, Att. D, ¶11, JA222 (Affidavit of Adam Keech). PJM refers to this situation as an "economic shortage." *Id.* Under those conditions, PJM will purchase reserves at a price of $850/MWh from all resources that offered no more than that price, but will not purchase reserves within market necessary to meet the full minimum reserve requirement represented by Step 1 because the remaining reserve offers exceed the $850/MWh Reserve Penalty Factor. *Id.*; *see* Figure 7, *infra*.



*Figure 7* Reserve Economic Shortage Event

If PJM proffered data that Scenario 4 had occurred, then it might have had a stronger case that its $850/MWh Reserve Penalty Factor is too low, and should be bumped up, perhaps even to $2,000/MWh. But the record does not show that Scenario 4 has ever occurred, thus indicating that a maximum $850/MWh Reserve Penalty Factor is not too low to avert a reserve shortage event. *See* 2022 Remand Reh'g Order PP 26, 49, JA996–997, 1010. That lack of data is unsurprising, given that the physical characteristics of PJM's generation fleet and energy market supply and demand conditions cause a large amount of $0/MWh reserve supply to be available most of the time, which causes reserve market clearing prices to be $0/MWh *in most cases*—56.8% and 97.5% of the time in 2018, depending on the type of reserve. 2021 Remand Order P 41 n.91, JA910; 2022 Remand

57

Reh'g Order P 77 & n.236, JA1033–1035; *see supra* p.13, n.3 (describing different reserve markets).

b.  Nor does a $0/MWh clearing price somehow reveal a failure of the reserve market to procure sufficient reserves.[18]  As the Market Monitor explained, an offer of $0/MWh simply reflects that the resource incurs no incremental costs to hold some of its generating capability in reserve.  *See* 2022 Remand Reh'g Order PP 58, 77, JA1019–1020, 1033–1035.  For example, PJM might dispatch only part of the capacity of a large natural gas plant in the energy markets because the plant's full output capability is not needed to meet load-serving entities' energy demand.  *See id*. P 77, JA1033–1035.  Because the whole plant is operational yet "dispatched below the amount of energy [it] is willing and capable of supplying, the resource has uncommitted capacity that could be deployed if called upon."  *Id*.  "Under these conditions, the resource is not incurring any opportunity costs" by committing its excess capacity to reserves, meaning a $0/MWh bid is economic and simply "a reflection of supply and demand conditions in the PJM market."  *Id*.

---

[18]  The Generators made this argument in their rehearing application, *see* Remand Reh'g Order P 77 & n.233, JA1033–1035, but do not advance it in their opening brief; it is forfeited, *see Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019).

3. Yet, the Generators insist, "'operators can and do procure reserves at prices above $850/MWh[.]'" Br. 59 (quoting Generators' Reh'g Application at 17, JA961). But this assertion, which not even PJM made in its filings,[19] lacks record support. Indeed, "[c]ontrary to [the Generators'] claim, PJM's complaint failed to document any instances where operators have procured reserves from a resource with opportunity costs greater than $850/MWh through" out-of-market purchases. 2022 Remand Reh'g Order P 51, JA1011–1013; *see also id*. PP 26–27, JA996–997. In short, raising the $850/MWh maximum Reserve Penalty Factor is a solution in search of a problem.

4. Worse, adopting the Generators' preferred $2,000/MWh Penalty Factor would likely hike energy prices for consumers who would foot the bill. *See* 2022 Remand Reh'g Order P 71, JA1029–1030. This is not just a

---

[19]    The Generators might have derived this assertion from the 2020 Reserve Market Order, which concluded, after discussing evidence of positive biasing (*see infra* pp.62–63), that "PJM's operators will, and do, acquire needed reserves at costs in excess of what the current reserve market design allows to be reflected in price." P 81 & n.149, JA689–690 (citing PJM Proposal at 34–35, JA39–40); *see also* PJM Proposal at 32–33, JA37–38. But the cited evidence does not support the proposition. The relevant pages of PJM's submission show only that such high costs are *theoretically possible*. *See* 2022 Reserve Market Reh'g Order P 51, JA1011–1013.

reasonable economic prediction for which the Commission deserves deference. *See Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 560–561 (D.C. Cir. 2022); *New Jersey*, 744 F.3d at 111. It is also the expert opinion of the Market Monitor, 2022 Remand Reh'g Order P 71 & n.218, JA1029–1030 (citing Market Monitor Protest at 11, 32–33, JA279, 300–301), and PJM itself, which estimated that PJM's Revised Demand Curve proposal would increase prices for consumers by approximately $556 million per year, *id.* P 12 & n.33, JA988 (citing PJM Proposal at 114, JA119). The price increase would result from, among other things, the shape of PJM's Revised Demand Curve, which would cause PJM to procure more reserves than needed and at higher market prices than it currently does. *See* Figure 3, *supra* p.17; 2022 Remand Reh'g Order P 71, JA1029–1030 (explaining FERC's responsibility "to protect consumers from excessive rates"); Market Monitor Protest at 7, 44–45, JA275, 312–313.

5. Finally, the Commission satisfied the standard for switching its position with the Remand Orders. An agency may alter course if it "display[s] awareness that it *is* changing position," "show[s] that there are good reasons for the new policy," and explains why it is "disregarding facts" previously relied upon. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

515–516 (2009); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances." (cleaned up)).  Contrary to the Generators' assertions, the Commission satisfied this standard here:  It explained that the 2020 Reserve Market Orders' rejection of the $850/MWh Reserve Penalty Factor was based on "insufficient record support," given (1) the lack of historical data showing that PJM operators had been short of reserves at the $850/MWh rate, and (2) the lack of data showing that needed reserve resources had—or would in the future—incur opportunity costs exceeding $850/MWh.  2022 Remand Reh'g Order PP 31–32, 45–46, JA998–999, 1007–1008.  Thus, the Commission rejected the 2020 Orders' reliance on the 2016-enacted $2,000/MWh energy market offer cap as showing that *needed* reserve resources would lack an incentive to provide reserve capacity at the $850/MWh rate.  2021 Remand Order PP 28–30, JA903–905; 2022 Remand Reh'g Order P 45, JA1007–1008.

**B.    PJM and the Generators failed to prove that biasing of energy demand projections reflects a deficiency in the Legacy Demand Curve**

1.  The Generators also argue that the Legacy Demand Curve's reserve requirements (Steps 1 and 2A) are too low to capture *actual* reserve demand. They reason that PJM has historically procured reserves beyond the Curve's minimums—i.e., beyond Step 2A.  *See* Br. 49–51; *see* Figure 2, *supra* p.10. But that is flatly incorrect.  In fact, the Generators' cited authority does not support their proposition.  *See* Br. 49–50 (citing 2020 Reserve Market Order PP 77–78, JA688).  Paragraphs 77 and 78 of the 2020 Reserve Market Order state only that PJM operators have positively biased—i.e., projected upwards—the load forecast they enter into one of the software programs used to dispatch the generation fleet.  *See* 2020 Reserve Market Order P 77, JA688 ("PJM operators are routinely biasing market software inputs … because, in their judgment and experience, the need for reserves to operate the PJM system reliably will far exceed the contingency-based [minimums]" in the Legacy Demand Curve.).  *But see id*. P 80, JA689 (inferring, based on operator biasing data and without any citation to the record, that PJM operators *actually* "need to procure thousands of additional [megawatts] of reserves").  As the Market Monitor explained and as the Commission

concluded in the Remand Orders, "[t]here is not a one-to-one relationship between operator biasing actions and [resource] commitment decisions." *See* 2022 Remand Reh'g Order P 78, JA1035–1036.

Put another way, PJM and the Generators failed to show that operators' adjustments to load forecasts—that is, biasing forecasted *energy* demand—is a suitable proxy for PJM's actual demand for *reserves*, such that a conclusion could be drawn that the Legacy Demand Curve's reserve requirements are too low. *See* 2022 Remand Reh'g Order P 69, JA1027–1028 ("PJM fails to demonstrate that its cited forecast uncertainties and the actions taken in response to those uncertainties render PJM's [Legacy Demand Curve] unjust and unreasonable."); *id*. P 82, JA1038–1041 ("[L]oad forecast biasing … does not constitute 'additional procurement' of reserves beyond the reserve requirements or [Legacy Demand Curve] … in PJM's tariff.").

PJM itself arrived at a similar conclusion years ago. In a prior filing, PJM expressly disclaimed any direct connection between its operators' positive biasing of load and the generating units PJM "commits"—i.e., directs to come online. *See* 2021 Remand Order P 39, JA908–909 (quoting PJM's explanation that biasing inputs are mere "suggestions" for *actual*

future generating unit commitments, and "additional analyses" are conducted "once these suggestions are received").

Given all this, FERC reasonably rejected the conclusions of the pre-remand 2020 Reserve Market Orders and the evidence of reserve demand (i.e., positive biasing data) that those orders relied upon. *See Fox*, 556 U.S. at 515–516; *see also Biestek*, 139 S. Ct. at 1154.

2. The Generators' conflation of operator biasing with actual reserve demand causes them to commit another error. They observe that, beyond the Legacy Demand Curve's minimum reserve requirement (Step 1) plus a 190 MW buffer (Step 2A), the Curve sets a Reserve Penalty Factor of $0/MWh. Br. 49. And because the Generators believe—based on biasing data—that PJM needs reserves beyond that buffer, they conclude that PJM has unjustly valued *needed* reserves as "worthless." *Id.*

The Generators are incorrect. As a first matter, the Generators did not make this argument in their rehearing application; it is jurisdictionally forfeited. *See Entergy*, 391 F.3d at 1246–1247. *Cf.* Generators' Reh'g Application at 26, JA970 (asserting that $0/MWh reserve market *clearing prices*, not $0/MWh *penalty factors*, fail to reflect reserve resources' true value). Further, because the alleged need for additional reserves beyond the

Legacy Demand Curve minimums is speculative (as just discussed), there is no basis for concluding that reserve capacity beyond Step 2A must be valued at something more than zero.  *See* 2022 Remand Reh'g Order P 69, JA1027–1028.  And even if such reserve resources *were* needed, the Generators are wrong as a matter of fact that PJM's market mechanisms value them as "worthless."  All generation resources, regardless of what price they receive on the reserve markets, earn revenue from two additional sources.  They make money by selling their capacity on the PJM capacity market, Order 719 Compliance Order PP 44, 58, and, if a reserve-committed resource is actually dispatched to provide power, it receives the prevailing price set on the energy markets, *see* PJM Operating Agreement Schedule 1, §3.2.1, A30.

> ### C. PJM and the Generators failed to prove that out-of-market payments made to reserve resources reflect a defect in the Legacy Demand Curve

The Generators seize on yet another data point and, once again, erroneously conclude that its cause must be a defective Legacy Demand Curve.  They assert that a significant amount of revenue—46.2% in 2018, according to the Market Monitor—for PJM's procurement of reserve power is the result of "'out-of-market, pay-as-bid uplift payments, rather than through market clearing prices.'"  Br. 55–56, 60 (quoting 2020 Reserve

Market Order P 82, JA690).  But the Generators assume, as PJM itself did in its Revised Demand Curve proposal, *see* 2020 Reserve Market Reh'g Order P 14 & n.43, JA822–823, that such out-of-market payments are caused by a deficiency in the Legacy Demand Curve—specifically, Reserve Penalty Factors that are too low.  *See* Br. 50–51, 55–56; 2020 Reserve Market Order P 82, JA690 (accepting this view).

The Commission reasonably found otherwise on remand.  In changing course, the Commission credited a finding, also made by the Market Monitor, that uplift is not due to "any deficiency of the [Legacy Demand Curve]." 2022 Remand Reh'g Order P 58, JA1019–1020.  In doing so, the Commission expressly addressed and discounted its prior reliance on PJM's representations that uplift payments are primarily caused by operators' positive load forecast biasing and, in turn, a deficiency in the Legacy Demand Curve.  *Id.* P 78 & n.244, JA1035–1036.  Specifically, on remand the Commission "agree[d] with the [Market Monitor] that the record evidence does not demonstrate a link between operator actions or the shape of the [Operating Reserve Demand Curves] and actual uplift payments."  *Id.* P 78, JA1035–1036.  And the Commission deemed credible the Market Monitor's expert opinion that "uplift payments [for reserve capacity in particular]

primarily arise from incorrect settlement calculations and a mismatch

between the dispatch interval and the pricing interval, an issue PJM recently

corrected, and *not from the shape of the [Legacy Demand Curve].*" *Id.* P 78 &

n.245, JA1035–1036 (emphasis added) (citing Market Monitor Answer at 8–

9, JA627–628 (July 16, 2019)).

The Commission also rebutted the premise that uplift is inherently

problematic, even if it were true that uplift *does* result from the Legacy

Demand Curve. FERC explained that "[wholesale market] operators

regularly take out-of-market actions to maintain reliable operations"; taking

the existence of uplift to indicate an intrinsic unlawfulness in PJM's rates

"potentially could tie the hands of the operators making key decisions to

maintain reliability." *Id.* P 78, JA1035–1036. The Commission's

record-rooted discussion easily satisfies *Fox*'s "reasoned explanation"

standard for rejecting its contrary finding. *See Fox*, 556 U.S. at 515–516; *see
also Biestek*, 139 S. Ct. at 1154.

The Generators ignore the Commission's explanation for the cited

uplift payments, much less rebut it. That omission is particularly

conspicuous given that the same author (the Market Monitor) supplied both

the 2018 uplift data the Generators rely on (the 46.2% figure) *and* the report

refuting the Generators' explanation *for* that data.  In any event, the

Commission is entitled to great deference for its credibility determinations.

*See, e.g.*, *TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 119 (D.C. Cir. 2013)

("[W]here the Commission weighs competing record evidence, [the court]

defer[s] to its reasonable choice[.]"); *Wis. Valley Improvement v. FERC*, 236

F.3d 738, 746–747 (D.C. Cir. 2001) (deference to Commission's resolution of

"factual dispute[s]" involving "disputing expert witnesses" (cleaned up)).

> **D.  PJM and the Generators failed to prove that the step-wise Legacy Demand Curve is unjust and unreasonable**

But, the Generators urge, the step-wise shape of the Legacy Demand

Curve offers another reason to deem it unlawful.  They contend that the

Curve unjustly values the 190th MWh of Step 2A at $300/MWh, and then

precipitously sinks that valuation to $0/MWh for the 191st MWh.  *See*

Br. 51.  They argue that PJM's proposed sloped demand curve (*see* Figure 3,

*supra* p.17) provides more accurate valuations for each additional MWh of

demand.

The Commission did not prejudge the justness and reasonableness of a

sloped demand curve.  *Cf.* 2022 Remand Reh'g Order P 77, JA1033–1035.

But it correctly deemed that point irrelevant to the pertinent legal question

under Step A of Federal Power Act Section 206: whether the Legacy Reserve Curve is, itself, unjust and unreasonable. *See Int'l Transmission*, 988 F.3d at 483. The Commission explained that, while a sloped demand curve might produce different pricing outcomes, that does not demonstrate the unlawfulness of the Legacy Demand Curve. 2022 Remand Reh'g Order P 77, JA1033–1035.

Nor does the Commission's endorsement of sloped demand curves in other contexts—e.g., the PJM capacity market—compel its use in reserve markets. *See id.* P 88, JA1044–1045. The Commission has long-recognized that capacity and reserve markets are "distinct," and has not purported to extrapolate its findings made in the context of capacity markets to other market regimes. *Id.* The Generators fail to refute this explanation, offering only the unremarkable observation that the Commission has found vertical demand curves to be unjust and unreasonable "in other markets." Br. 51–52 (citing a FERC decision concerning capacity market rules).

**E.** **PJM and the Generators failed to prove that an unlikely, hypothetical future event of up-to $2,000/MWh opportunity costs requires deeming the $850/MWh Reserve Penalty Factor unjust and unreasonable**

The Generators next argue that "the concern is ensuring that market prices reflect costs" in setting Reserve Penalty Factors, and not, as the Commission considered, the *frequency* with which a resource's opportunity costs reach up to $2,000/MWh. Br. 57. For support, the Generators quote the 2020 Reserve Market Orders, which endorsed raising the Reserve Penalty Factors to $2,000/MWh to capture opportunity costs above $1,000/MWh, "'even if [such opportunity costs] are relatively rare.'" *Id.* (emphasis omitted) (quoting 2020 Reserve Market Reh'g Order P 81, JA848–849).

1. The Generators misapprehend the Commission's analysis. The Commission explained that the 2020 Reserve Market Rehearing Order's statement, quoted above, is inapposite because it answers a different question: whether, having determined that the $850/MWh rate is unjust and unreasonable, the $2,000/MWh cap is, by contrast, just and reasonable. 2022 Remand Reh'g Order P 52, JA1013–1014. The distinction is crucial because it speaks to a material difference in the standard of review. Once the

Commission decided that the $850/MWh rate was unjust and unreasonable in the 2020 Orders (Step A of the Federal Power Act Section 206 inquiry), it proceeded to consider whether PJM's proposal—a $2,000/MWh maximum Reserve Penalty Factor—was just and reasonable (Step B of the Section 206 inquiry). *See* 2020 Reserve Market Reh'g Order P 81, JA848–849; *see also supra* pp.14–15 (explaining the statutory two-step analysis). The Commission found that the $2,000/MWh rate cleared the more forgiving Step B hurdle because a higher rate necessarily increases the odds that the reserve markets will capture *all* resource bids necessary to meet minimum reserve requirements. *See* 2020 Reserve Market Order P 153, JA719; *see also Emera Me.*, 854 F.3d at 25 ("[T]he just and reasonable lodestar is no loftier under section 206 than under section 205[.]" (cleaned up)). Thus, PJM made the requisite showing at Step B that, irrespective of the merits of the $850/MWh rate, a $2,000/MWh rate was just and reasonable. *See* 2020 Reserve Market Reh'g Order P 81, JA848–849.

In the Remand Orders, the Commission did not reject its prior Step B finding. *See* 2022 Remand Reh'g Order P 52, JA1013–1014. Instead, it found at Step A of the Section 206 analysis that an $850/MWh rate is not *un*just and *un*reasonable. *Id.* The Commission explained that PJM failed to

show that its hypothetical scenario of resources (1) incurring opportunity costs exceeding $850/MWh, in a way (2) that would result in a reserve shortage event, was likely to occur "with sufficient frequency" to render the $850/MWh rate unlawful. *Id.* That conclusion was responsive to *PJM's own* statement, made in its Revised Demand Curve proposal, that made frequency an issue in the first place: "PJM … chose to support its complaint based upon evidence showing that opportunity costs might rarely exceed $850/MWh, but now argues that the frequency of an event is irrelevant to the economic theory." *Id.* P 53, JA1014–1016. Thus, properly framed, the Commission reasonably concluded that a rare—and hypothetical—future reserve shortage scenario is inadequate to render a current rate unjust and unreasonable.

2. The Generators rejoin that the Commission departed from its own precedent of setting new rates even in the face of "low frequency" occurrences of reserve market shortages. *See* Br. 58–59. But that is incorrect. In both the Order 719 Compliance Order and Order 831 (Br. 57–59), the Commission found that low frequency mismatches between the market price of a service and the underlying cost and value of the service justified market reforms. *See* Order 719 Compliance Order P 63; Order 831,

PP 36, 42; *see also* 2022 Remand Reh'g Order P 53, JA1014–1016; *supra* pp.11, 18 (discussing the Order 719 Compliance Order and Order 831). Those orders do not stand for the proposition that hypothetical, future such low frequency events require raising existing Reserve Penalty Factors. *Cf.* Order 831, PP 34–35 (describing costs exceeding the prior $1,000/MWh energy offer cap as "concrete rather than hypothetical," and observing that "recent history demonstrates that resource short-run marginal costs can exceed $1,000/MWh"); *see also* 2022 Remand Reh'g Order P 53, JA1014–1016.

The Generators' reliance on Order 831 is particularly misplaced for an additional reason. There, the Commission expressly declined to raise Reserve Penalty Factors on the exact basis the Generators invoke here: that Order 831 raised the energy market offer cap to $2,000/MWh. *See* Order 831, PP 211, 213; 2022 Remand Reh'g Order P 53, JA1014–1016.

> **F.** **The Generators' complaint that FERC failed to consider regulatory stability concerns is incorrect as a matter of law; in any event, the Commission addressed the concern**

The Generators make a last stand by asserting that FERC did not address regulatory stability concerns in overturning its 2020 Reserve Market Orders. Br. 41.

1.  The Generators' argument is incorrect as a matter of law.  When a court remands the record to the agency for reconsideration of its prior decision, the agency "deal[s] with the problem *afresh*, performing the function delegated to it by Congress."  *Chenery*, 332 U.S. at 201 (emphasis added) (quoted at 2022 Remand Reh'g Order P 104 n.322, JA1054); *accord Se. Mich. Gas*, 133 F.3d at 38 (quoted at Remand Reh'g Order P 104 n.322, JA1054) ("Once FERC reacquired jurisdiction" after the D.C. Circuit's remand, "it had the discretion to reconsider the whole of its original decision.").  Here, dealing with the problem "afresh" meant considering *in the first instance* whether PJM had shown, in filing its Revised Demand Curve proposal, that the Legacy Demand Curve was unjust and unreasonable.  *See* 2022 Remand Reh'g Order P 104 & n.322, JA1053–1054. That principle of administrative law is mutually reinforcing with FERC's statutory obligation under Federal Power Act Section 206.  If the Commission concludes, as it did here, that a complainant has not met its burden of proving that the existing rate is unjust and unreasonable, then the Commission is statutorily required to reject the complaint.  *See Emera Me.*, 854 F.3d at 25.

2. The Generators also complain that the Commission ignored their regulatory stability argument.  Br. 46.  But the Commission *did* respond to this concern, explaining that "[the Generators] identify no limit, in either the [Federal Power Act] or the court's directive, on the Commission's authority to further consider this matter on remand and to act accordingly, and we are aware of none."  *Compare* 2022 Remand Reh'g Order P 103, JA1052–1053 (identifying the Generators' regulatory stability concern), *with id.* P 104, JA1053–1054 (responding to this concern).  And while the Generators might prefer FERC to have articulated the "magic words" "regulatory stability," *see Garland v. Ming Dai*, 141 S. Ct. 1669, 1679 (2021) (cleaned up), that is not the law.  Even if the Commission's response is "of less than ideal clarity," the Court must uphold its decision because "the agency's path may reasonably be discerned."  *See id.* (cleaned up).

3. But, the Generators continue, the Commission has previously emphasized the importance of "'stability and regulatory certainty … in its decision-making process.'"  Br. 43 (quoting *Rail Splitter Wind Farm, LLC v. Ameren Servs. Co.*, 142 FERC ¶61,047, P 31 (2013)).  Their cited orders, however, are inapt.  Two (at Br. 43) discuss regulatory stability in the distinct context of FERC's refusal to modify contracts where doing so would

upset parties' settled expectations.  And two (at Br. 43–44) include lone

concurring statements by two Commissioners invoking the general virtue of

maintaining regulatory predictability.

4.  In any event, the reasonableness of a regulated entity's reliance on

existing regulatory conditions is highly attenuated where, as here, the agency

outcome is neither finally decided nor longstanding.  "When an agency

changes course, … it must be cognizant that *longstanding* policies may have

*engendered serious reliance interests* that must be taken into account."  *Dep't*

*of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020)

(emphasis added) (cleaned up).  Here, PJM's proposal was challenged in

court even before the Commission issued the 2020 Reserve Market

Rehearing Order, meaning the final outcome of PJM's Revised Demand

Curve proposal was always in doubt.  *See supra* pp.19–20.  A policy whose

prospects are suspect from the get-go does not reasonably "engender[]

serious reliance interests."

Nor was FERC's acceptance of PJM's proposal longstanding.  The

Commission announced its intention to revisit the 2020 Orders (in the 2021

Remand Motion) just nine months after it issued the 2020 Reserve Market

Rehearing Order.  *Cf. Regents*, 140 S. Ct. at 1913 (departure from an

approximately five-year-old policy triggered reliance interests); *MediNatura, Inc. v. FDA*, 998 F.3d 931, 935–936, 940–941 (D.C. Cir. 2021) (departure from an approximately 31-year-old policy triggered reliance interests).

\* \* \*

The Court's arbitrary-and-capricious review of FERC's decision is "extremely narrow." *Oakbrook*, 28 F.4th at 720 (cleaned up). Given the "great deference" afforded FERC "in a technical area like electricity rate design," *FERC v. EPSA*, 577 U.S. at 292 (cleaned up), and the "relevant evidence" in the record that is more than "adequate to support [FERC]'s conclusion," *Biestek*, 139 S. Ct. at 1154, the Court should uphold FERC's determination that PJM and the Generators failed to meet their Federal Power Act Section 206 burden of proving that the Legacy Demand Curve is unjust and unreasonable.

## CONCLUSION

For the foregoing reasons, the Court should deny the petitions for review.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Jared B. Fish*
Jared B. Fish
Attorney

Federal Energy Regulatory Commission
Washington, DC 20426
Tel.: (202) 502-8101
E-mail: Jared.Fish@ferc.gov

June 21, 2023

# CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(a)(7)(B), (f), and (g), and this Court's briefing order of February 1, 2023, I certify that the Brief for Respondent has been prepared in a proportionally spaced typeface (using Microsoft Word, in 14-point Century Supra) and contains 14,983 words, not including the tables of contents and authorities, the glossary, the certificates of counsel, and the addendum.

*/s/ Jared B. Fish*
Jared B. Fish
Attorney

Federal Energy Regulatory Commission
Washington, DC 20426
Tel.: (202) 502-8101
E-mail: Jared.Fish@ferc.gov

June 21, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk

of the Court for the United States Court of Appeals for the Sixth Circuit by

using the appellate CM/ECF system on June 21, 2023.  Participants in the

case will be served by the appellate CM/ECF system.

*/s/ Jared B. Fish*
Jared B. Fish
Attorney

Federal Energy Regulatory Commission
Washington, DC 20426
Tel.: (202) 502-8101
E-mail: Jared.Fish@ferc.gov