No. 22-3176
(consolidated with No. 22-3666, 22-3794 & 22-3796)

*In the*

# United States Court of Appeals

*for the*

# Sixth Circuit

---

ELECTRIC POWER SUPPLY ASSOCIATION,

*Petitioner,*

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

PJM POWER PROVIDERS GROUP,

*Petitioner,*

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

On petition for review of orders of the
Federal Energy Regulatory Commission

---

## CORRECTED FINAL BRIEF OF PETITIONERS

---

PAUL W. HUGHES
DAVID G. TEWKSBURY
ANDREW A. LYONS-BERG
CONNOR J. SUOZZO
*McDermott Will & Emery LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for Petitioners*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners request oral argument. The factual background is detailed, and the legal issues concerning the scope of the FERC Chairman's authority and the reinstatement of PJM's former market design are important ones. Oral argument would likely assist the Court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioners Electric Power Supply Association ("EPSA") and The PJM Power Providers Group ("P3") hereby submit the following disclosure statement in the above-captioned cases:

EPSA and P3 are not public companies, have no parent corporations, and no publicly held corporation owns 10% or more of either company's stock. No publicly owned corporation not a party to the appeal has a financial interest in the outcome of the litigation.

*/s/ Paul W. Hughes*

i

# TABLE OF CONTENTS

Statement Regarding Oral Argument ......................................................... i

Corporate Disclosure Statement ................................................................ i

Table of Authorities.................................................................................. iii

Introduction ................................................................................................1

Jurisdictional Statement ............................................................................4

Issues Presented for Review ......................................................................6

Statement....................................................................................................7

    A.    PJM's reserves market .................................................................7

    B.    FERC adopts revisions to PJM's Tariff and
           Operating Agreement. ...............................................................12

    C.    FERC's voluntary remand order................................................16

Summary of the Argument ......................................................................19

Standard of Review .................................................................................21

Argument .................................................................................................22

I.    The Chairman's request for voluntary remand exceeded statutory
    authority..........................................................................................23

    A.    The Chairman lacks the power to unilaterally
           overturn a Commission decision. .............................................23

    B.    If interpreted to authorize the Chairman's action,
           the Federal Power Act would be unconstitutional...................35

II.    FERC's orders on voluntary remand were arbitrary and
    capricious........................................................................................41

    A.    FERC's reversal of its prior order based on no new
           evidence was arbitrary and capricious because it
           disregarded regulatory stability. ..............................................42

    B.    FERC's reversion to a vertical Demand Curve was
           arbitrary and capricious. ...........................................................48

    C.    FERC's reinstatement of the reserves price cap of
           $850/MWh was arbitrary and capricious. ................................55

Conclusion................................................................................................61

# TABLE OF AUTHORITIES

## Cases

*Am. Gas Ass'n v. FERC,*
593 F.3d 14 (D.C. Cir. 2010) ................................................. 47

*Andrus v. Glover Constr. Co.,*
446 U.S. 608 (1980) .............................................................. 27

*Bangura v. Hansen,*
434 F.3d 487 (6th Cir. 2006) ................................................. 22

*Bowsher v. Synar,*
478 U.S. 714 (1986) .............................................................. 36

*Carlson v. Postal Regul. Comm'n,*
938 F.3d 337 (D.C. Cir. 2019) ............................................... 47

*Complex Consol. Edison Co. of N.Y., Inc. v. FERC,*
165 F.3d 992 (D.C. Cir. 1999) ............................................... 33

*Consumer Energy Council of Am. v. FERC,*
673 F.2d 425 (D.C. Cir. 1982) ............................................... 38

*Delaware Div. of Pub. Advoc. v. FERC,*
3 F.4th 461 (D.C. Cir. 2021) ................................................. 17

*Discount Tobacco City & Lottery, Inc. v. United States,*
674 F.3d 509 (6th Cir. 2012) ............................................ 35, 41

*Dixon v. United States,*
381 U.S. 68 (1965) ................................................................ 30

*Emera Me. v. FERC,*
854 F.3d 9 (D.C. Cir. 2017) .................................................. 32

*Environmental Health Trust v. FCC,*
9 F.4th 893 (D.C. Cir. 2021) ................................................. 52

*F.C.C. v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ..................................................... *passim*

*Fed. Election Comm'n v. Ted Cruz for Senate,*
142 S. Ct. 1638 (2022) .......................................................... 28

*FERC v. Elec. Power Supply Ass'n,*
577 U.S. 260 (2016) .......................................................... 22, 37

**Cases—continued**

*FTC v. Flotill Prods., Inc.*,
389 U.S. 179 (1967) ............................................................... 23

*Genuine Parts Co. v. Env't Prot. Agency*,
890 F.3d 304 (D.C. Cir. 2018) ............................................. 54

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020) ............................................... 46

*Helen Mining Co. v. Elliott*,
859 F.3d 226 (3d Cir. 2017) ................................................ 37

*Hirschey v. FERC*,
701 F.2d 215 (D.C. Cir. 1983) ........................................ 30, 31

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ...................................................36, 37, 41

*Int'l Union, United Auto., Aerospace & Agric. Implement*
*Workers of Am. v. N.L.R.B.*,
802 F.2d 969 (7th Cir. 1986) ............................................... 54

*K N Energy, Inc. v. FERC*,
968 F.2d 1295 (D.C. Cir. 1992) ...................................... 47, 61

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ............................................... 28

*Louisville Gas & Elec. Co. v. FERC*,
988 F.3d 841 (6th Cir. 2021) ................................21, 48, 49, 52

*Me. Pub. Utils. Comm'n v. FERC*,
520 F.3d 464 (D.C. Cir. 2008) ......................................... 33, 34

*Merck & Co., Inc. v. HHS*,
962 F.3d 531 (D.C. Cir. 2020) ............................................. 33

*MISO Transmission Owners v. FERC*,
860 F.3d 837 (6th Cir. 2017) ............................................ 4, 21

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ............................................... 39

*Morrison v. Olson*,
487 U.S. 654 (1988) .....................................................38, 39, 40

## Cases—continued

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ........................................................................ *passim*

*N.J. Bd. of Pub. Utils. v. FERC*,
 744 F.3d 74 (3d Cir. 2014) ................................................................ 7

*NAACP v. FPC*,
 425 U.S. 662 (1976) ......................................................................... 44

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
 142 S. Ct. 661 (2022) ....................................................................... 28

*Natural Gas Clearinghouse v. FERC*,
 965 F.2d 1066 (D.C. Cir. 1992) ....................................................... 37

*Nealon v. Davis*,
 18 F.2d 175 (D.C. Cir. 1927) .......................................................... 39

*New England Power Co. v. FERC*,
 533 F.3d 55 (1st Cir. 2008) ............................................................. 47

*NorAm Gas Transmission Co. v. FERC*,
 148 F.3d 1158 (D.C. Cir. 1998) ............................................. 46, 47, 61

*Nuclear Energy Inst., Inc. v. EPA*,
 373 F.3d 1251 (D.C. Cir. 2004) ....................................................... 45

*Oakbrook Land Holdings, LLC v. Comm'r of Internal Rev.*,
 28 F.4th 700 (6th Cir. 2022) ...................................................... 42, 47

*Ohio Fast Freight, Inc. v. United States*,
 574 F.2d 316 (6th Cir. 1978) ........................................................... 45

*Panhandle E. Pipe Line Co. v. FERC*,
 196 F.3d 1273 (D.C. Cir. 1999) ....................................................... 58

*PPL Wallingford Energy LLC v. FERC*,
 419 F.3d 1194 (D.C. Cir. 2005) ....................................................... 61

*Pub. Citizen, Inc. v. FERC*,
 839 F.3d 1165 (D.C. Cir. 2016) .................................................. 23, 27

*Pub. Serv. Comm'n of N.Y. v. FPC*,
 543 F.2d 757 (D.C. Cir. 1974) ............................................. 24, 25, 27, 29

*Seila Law LLC v. CFPB*,
 140 S. Ct. 2183 (2020) ............................................................... *passim*

**Cases—continued**

*Sierra Pac. Power Co. v. FPC*,
   350 U.S. 348 (1956) ............................................................ 32

*Tenn. Republican Party v. SEC*,
   863 F.3d 507 (6th Cir. 2017) ............................................... 6

*Tenneco Gas v. FERC*,
   969 F.2d 1187 (D.C. Cir. 1992) ...................................... 54, 59

*Texas v. Biden*,
   10 F.4th 538 (5th Cir. 2021) .............................................. 46

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021) ........................................... 3, 54

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) ............................................................ 37

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) .............................................................. 27

*In re Ultra Petroleum Corp.*,
   28 F.4th 629 (5th Cir. 2022) .............................................. 31

*United States v. Palomar-Santiago*,
   141 S. Ct. 1615 (2021) ........................................................ 36

*Util. Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014) ............................................................ 22

*Valero Interstate Transmission Co. v. FERC*,
   903 F.2d 364 (5th Cir. 1990) .............................................. 31

*W. Deptford Energy, LLC v. FERC*,
   766 F.3d 10 (D.C. Cir. 2014) .............................................. 58

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
   475 F.3d 319 (D.C. Cir. 2006) ............................................ 45

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ............................................................ 35

## Agency decisions

*Association of Businesses Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*,
173 FERC ¶ 61,159 (2020) ........................................................ 43

*Independent Market Monitor for PJM v. PJM Interconnection, L.L.C.*,
178 FERC ¶ 61,022 (2022) ........................................................ 44

*ISO New England Inc.*,
153 FERC ¶ 61,338 (2015) ........................................................ 52

*Nevada Power Co. v. Duke Energy Trading & Mktg., L.L.C.*,
99 FERC ¶ 61,047 (2002) ........................................................ 43

*Offer Caps in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*,
Order No. 831, 157 FERC ¶ 61,115 (2016) ...................................... 12, 57

*PJM Interconnection, L.L.C.*,
139 FERC ¶ 61,057 (2012) ........................................................ 56, 58

*Rail Splitter Wind Farm, LLC v. Ameren Servs. Co.*,
142 FERC ¶ 61,047 (2013) .................................................... 43, 44, 45, 46

## Constitutional provisions and statutes

U.S. Const. Art. II, § 1, cl. 1 ...................................................... 36, 38

16 U.S.C.
§ 824d ............................................................................ 12
§ 824e ........................................................................ *passim*
§ 825*l* ............................................................................ 4
§ 825*l*(a) ........................................................................ 30
§ 825*l*(b) ........................................................................ 4, 30

28 U.S.C. § 2112(a)(5) ................................................................ 5

42 U.S.C.
§ 7171(b) ...................................................................... 37, 40
§ 7171(c) ..................................................................... *passim*
§ 7171(e) ..................................................................... *passim*
§ 7171(i) .................................................................... 19, 25, 27

**Other authorities**

Statement of James P. Danly, FERC Docket No. ER21-2582
    (Aug. 26, 2022)......................................................................................26, 38

*About FERC*, perma.cc/V37U-NN7Z............................................................ 43

PJM, *Reserves*, perma.cc/PZ9A-MF8A.......................................................... 8

PJM, *Territory Served*, perma.cc/C4RM-DE2Q ............................................ 7

## INTRODUCTION

This case concerns the procedures an agency must follow when it wishes to change its mind and overturn its own prior decision. Specifically, this case presents the question whether, once the Federal Energy Regulatory Commission ("FERC") has issued a majority decision that is challenged in court, FERC's Chairman has the power unilaterally to direct FERC's lawyers to seek a voluntary remand, effectively reopening a duly issued majority order of the Commission from which the Chairman himself had dissented. And on remand, FERC simply reversed its prior decision based on the exact same underlying factual record, without accounting for regulatory stability or distinguishing the factual findings underlying its prior, diametrically opposed order.

Under longstanding precedent, FERC fundamentally erred. The FERC orders challenged here are *ultra vires* by virtue of the Chairman's unlawful unilateral remand maneuver and also arbitrary and capricious both procedurally and substantively. They must be set aside.

**1.** In May 2020, FERC determined by a majority vote that certain provisions of PJM Interconnection L.L.C.'s ("PJM") Tariff and Operating Agreement were unjust and unreasonable. These provisions pertain to PJM's market for reserves—products needed to maintain the reliability of the bulk power system by addressing unanticipated failures or outages and

other real-time contingencies. FERC found, based on substantial evidentiary showings by PJM and others, that the applicable price caps and the shape of the demand curve for reserves were unjust and unreasonable.

As required by the Federal Power Act ("FPA"), FERC therefore adopted just and reasonable revisions to PJM's market design. FERC raised the price cap for obtaining the minimum supply of reserves from $850/MWh to $2,000/MWh, so that it equaled the recently increased price cap for energy. And FERC reshaped the demand curve for additional reserves from a stepwise, vertical curve that places no value on reserves beyond the minimum requirement to a downward-sloping curve, reflecting the fact that incremental reserves beyond that minimum requirement have reliability value.

**2.** While FERC's decision was pending review in the D.C. Circuit, then-Commissioner Richard Glick—who was the sole dissenter from the May 2020 decision—became FERC's Chairman. Then, without holding a vote of FERC's five Commissioners, he unilaterally directed FERC's Solicitor's Office to move for a voluntary remand so the Commission could reconsider the decision with which he had disagreed. On remand, and presented with the exact same record as before, FERC reversed substantial portions of its order, reinstating the same price cap and vertical demand curve it previously found to be unjust and unreasonable.

But FERC's organic statute, the Department of Energy Organization Act, provides that "[a]ctions of the Commission" require "a majority vote of the members present" (42 U.S.C. § 7171(e)); by contrast, the Chairman may act unilaterally "on behalf of the Commission" only with respect to limited ministerial functions "for the executive and administrative operation of the Commission" (*id.* § 7171(c)). The Chairman therefore exceeded his statutory authority by directing the motion for voluntary remand, which had the result of nullifying a duly issued Commission order and allowing FERC to start from scratch—all in the face of a statutory design that quite intentionally places a high burden on FERC to overturn a rate once adopted.

What is more, the new orders that followed the remand were arbitrary and capricious in their own right. FERC disregarded the importance of regulatory stability—a factor that the Commission has previously recognized as critical—even after the parties raised this deficiency in their motions for rehearing before the agency. And the reversal of FERC's prior position based on the same record and without additional briefing lacked reasoned decisionmaking, including by failing to adequately "explain[] why" its previous, contrary factual findings "were mistaken, misguided, or the like." *Texas v. Biden*, 20 F.4th 928, 991 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).

Regulated industries cannot thrive if agencies are allowed to overturn decisions on a whim, based not on new facts but on new leadership. The FPA, the Organization Act, and the Administrative Procedure Act are each designed to protect against such abuses. FERC's actions must be set aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this case pursuant to 16 U.S.C. § 825*l*, which provides for judicial review in this Court of orders issued by FERC under the FPA. A party aggrieved by a Commission order may obtain "review of such order in the United States court of appeals for any circuit wherein the … public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia." 16 U.S.C. § 825*l*(b).

PJM, the public utility to which the order relates, is located in part in the Sixth Circuit, as the transmission system and market it oversees includes all of Ohio and parts of Kentucky, Michigan, and Tennessee. Many of PJM's members—which are also public utilities to which the order relates (*see MISO Transmission Owners v. FERC*, 860 F.3d 837, 840 (6th Cir. 2017))—are also located in and have principal places of business within this Circuit. *See* Snitchler Decl. ¶ 13; Thomas Decl. ¶ 13. Moreover, Petitioners' members (also public utilities to which the order relates as participants in

PJM's markets) also own and operate numerous electric generation assets located in this Circuit. Snitcher Decl. ¶ 14; Thomas Decl. ¶ 14.

Petitioners Electric Power Supply Association ("EPSA") and The PJM Power Providers Group ("P3") jointly requested rehearing of FERC's December 22, 2021 order on January 21, 2022. After rehearing was denied on February 22, 2022, EPSA timely filed its petition for review in this Court in No. 22-3176 on March 2, 2022, and P3 timely filed its petition for review in the Third Circuit in No. 22-1452 on March 10, 2022. After FERC issued its order addressing arguments raised on rehearing on July 28, 2022, EPSA timely filed a supplemental petition for review in No. 22-3666 on August 8, 2022, and P3 timely filed a supplemental petition for review in the Third Circuit in No. 22-2458 on August 8, 2022.

After taking note of EPSA's petitions in the Sixth Circuit and recognizing that the underlying record would be filed there, the Third Circuit acknowledged that "[t]his Court may therefore be required to transfer" P3's petitions to the Sixth Circuit under 28 U.S.C. § 2112(a)(5). Order, *PJM Power Providers Group v. FERC*, No. 22-1452 (3d Cir. Mar. 16, 2022), Dkt. 3; Order, *PJM Power Providers Group v. FERC*, No. 22-1452 (3rd Cir. Aug. 10, 2022), Dkt. 49. The parties agreed that 28 U.S.C. § 2112(a)(5) required P3's cases to be transferred to the Sixth Circuit, and the Third Circuit ordered the transfer accordingly. Order, *PJM Power*

*Providers Group v. FERC*, Case No. 22-2458 (3rd Cir. Sep. 20, 2022), Dkt. 25.

EPSA and P3 each has organizational standing to petition for review through their members, all of whom do business, directly or indirectly through subsidiaries, in the PJM market, and are therefore affected by the rates governing that market. Snitchler Decl. ¶¶ 3-7; Thomas Decl. ¶¶ 3-7. *See Tenn. Republican Party v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017). Specific facts supporting Petitioners' standing are attested in the declarations attached as Exhibits A and B. *See id.* at 517 ("[O]n review of a final agency action, 'the petitioner [must] present specific facts supporting standing through citations to the administrative record or "affidavits or other evidence" attached to its opening brief, unless standing is self-evident.'").

## ISSUES PRESENTED FOR REVIEW

1. Whether then-Chairman Glick exceeded his statutory authority by unilaterally directing a voluntary remand of a majority FERC order—thereby reopening an order that otherwise would have been beyond the Commission's power to change—without a vote of the full Commission.

2. Whether FERC's orders on voluntary remand were arbitrary and capricious, including for failure to consider the important factor of

regulatory stability, and for of lack of reasoned decisionmaking in multiple respects.

## STATEMENT

### A.   PJM's reserves market

This case concerns reserves, which are products within the regional market for ancillary services administered by PJM. PJM is one of several regional transmission organizations and independent system operators, which are independent bodies that operate regional transmission grids and administer organized markets for electricity products within those grids, subject to FERC's regulatory oversight. *See generally N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 79 (3d Cir. 2014) (discussing the role of regional transmission organizations). PJM's territory is "a vast region covering thirteen states and the District of Columbia." *Id.* at 79; *see* PJM, *Territory Served*, perma.cc/C4RM-DE2Q.[1]

Reserves play a key role in ensuring the reliability of the electricity grid. Essentially, reserves are "resources"—such as the generation capability of a power plant—"that are not scheduled to serve load during the target period, but that are capable of providing energy on fairly short

---

[1]   The fourteen jurisdictions included within PJM in whole or in part are Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and the District of Columbia. *Id.*

notice if needed." PJM Transmittal 2, JA0007; *see also, e.g.*, PJM, *Reserves* (reserves are "electricity supplies that are not currently being used but can be quickly available in the case of an unexpected loss of generation"), perma.cc/PZ9A-MF8A.

PJM is required to maintain a minimum amount of reserves set by the North American Electric Reliability Corporation ("NERC"), the entity FERC has certified to oversee reliability of the overall North American grid. May 2020 Order ¶ 3, JA0660. This minimum ensures sufficient reserves for PJM to respond to the system's single largest contingency—typically, the potential loss of the system's largest online generator—within fifteen minutes. *Id*. PJM and other system operators also procure additional reserves, beyond the minimum, "to address other real-time operational uncertainties, such as deviations of load, generator availability, and performance from forecast values." Rehearing Order ¶ 4, JA0981-0982. PJM complies with the NERC mandate and its other operational requirements by specifying and procuring two distinct reserves products: "Operating reserve[s]" are [t]he amount of power that can be received within 30 minutes," while "primary reserve[s]" refers to power that can be received within ten minutes. PJM, *Reserves*, perma.cc/45LK-WBUY.

In general, PJM's markets price reserves using a market clearing model, in which resources submit offers to supply reserves at a particular

price, based on the resource's costs to do so. Starting with the lowest offer, PJM accepts increasingly higher offers until enough reserves are obtained, and the market "clears" at the price offered by the last resource necessary to supply the required reserves—meaning that all reserves, including those which had offered at a lower price, are compensated at that clearing price.

In clearing the operating reserves market, PJM employs an algorithm to co-optimize this market and the energy market in order to minimize the total cost of procuring both products. This co-optimization reflects the fact that a resource deployed to provide operating reserve will be forgoing the opportunity to provide energy and that more expensive resources may be dispatched to provide energy where other resources are needed to provide reserves.

PJM's Open Access Transmission Tariff and Operating Agreement also set out administratively determined Operating Reserve Demand Curves ("ORDCs" or "Demand Curves") to represent the system's demand for reserves. May 2020 Order ¶ 5, JA0661. The Demand Curve incorporates Reserve Penalty Factors, which represent the "maximum price[s] the market is willing to pay" to obtain an additional megawatt ("MW") of reserves. *Id.* The "Reserve Penalty Factors can also be thought of as the maximum cost PJM will incur, within market, to redispatch its system to procure an additional megawatt [] of reserves." *Id.*

In other words, when there are insufficient available reserves on the system for a given target period, "the reserve shortage is priced using the 'penalty factor' specified in the applicable ORDC," meaning that PJM will pay resources the Reserve Penalty Factor ($850/MWh) to supply the shortfall. PJM Transmittal 23, JA0028. Thus, the "ORDCs administratively set the amount of reserves to clear, define the limit on the cost the market is willing to incur to substitute reserves for energy, and functionally act as a 'cap' on the market clearing price to clearly indicate reserve shortages." *Id.* at 23-24, JA0028-0029.

Specifically, the price caps set out in the ORDCs are "tied to the NERC-mandated reserve requirements." May 2020 Order ¶ 76, JA0687. The current ORDCs are essentially vertical demand curves with step functions. For reserves needed to meet PJM's Minimum Reserve Requirements for a given five-minute interval, the price cap is $850/MWh— represented as a horizontal line from the left side of the Demand Curve. May 2020 Order ¶ 5, JA0661. Once the minimum reserve requirements are met, that maximum price drops vertically to the next "step" of the Demand Curve of $300/MWh, the price cap applicable to the next 190 MW of reserves procured. *Id.* This "second step" of the Demand Curve recognizes that reserves in excess of the NERC-imposed minimums will occasionally be needed to address operational uncertainties. Beyond those 190 megawatts,

10

there is another vertical drop-off to a price of zero, attributing no value to additional reserves beyond this point. Thus, if the NERC minimum has been satisfied for a given period, but an amount of reserves greater than 190 megawatts is needed (for example, to address problems related to forecast error),[2] such extra reserves are attributed zero value by the ORDCs.

The following ORDC—the pre-existing curve for synchronized reserves—is illustrative:



PJM Transmittal 24, JA0029.

The specific amount of the $850/MWh cap "was derived based on the average out-of-market payments to resources that were providing reserves during a shortage event in 2007." PJM Transmittal 28, JA0033. At the time,

---

[2]   PJM has to account for numerous real-time uncertainties that can unexpectedly require PJM to obtain additional reserves. For example, in the PJM market, the average wind forecast error is around 160 MW. May 2020 Order ¶ 36, JA0672.

the price cap for energy in PJM's markets was $1,000/MWh. *Id.* at 27, JA0032. Later, in November 2016, FERC increased the energy offer cap to $2,000/MWh. *Offer Caps in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 831, 157 FERC ¶ 61,115 (2016).

## B. FERC adopts revisions to PJM's Tariff and Operating Agreement.

**1.** In March 2019, PJM submitted filings with FERC proposing changes to its Tariff and Operating Agreement under Sections 205 and 206 of the Federal Power Act. 16 U.S.C. §§ 824d, 824e. PJM argued, as required under Section 206, that the Reserve Penalty Factors and Demand Curves for reserves were "unjust" and "unreasonable" (*id.* § 824e(a)) for two primary reasons. First, the vertical drop-off in the curves inaccurately represents that any additional reserves after 190 megawatts past the minimum requirements have zero value. PJM Transmittal 25-26, JA0030-0031. PJM thus proposed a downward-sloping curve instead, which would account for the value additional reserves provide "in reducing the risk of falling below the [minimum reserve requirements] in real-time." *Id.* at 26, JA0031.

Second, PJM explained, the price caps (*i.e.*, the Reserve Penalty Factors) were too low, forcing PJM operators to take out-of-market actions. *Id.* at 25-26, JA0030-0031. Specifically, "[b]ecause PJM's current rules allow sellers to submit energy market offers that are eligible to set" the energy market clearing price at "levels well in excess of $850/MWh, it follows that

resources providing reserves can have opportunity costs at approximately the same level of the energy offers of the resources committed to maintain reserves"—that is, up to $2,000/MWh. *Id.* at 49, JA0054.

As a result, "PJM operators regularly bias (i.e. effectively adding (or reducing) demand that must be balanced with additional (or less) supply) their scheduling of supply resources in an attempt to manage … uncertainty." PJM Transmittal 6, JA0011; *see also id.* at 34, JA0039. That is, PJM's employees have to put their thumbs on the scale of the reserve markets in order to ensure sufficient supply is procured.

In addition, "*the market's* refusal to recognize [a] resource" whose "cost to provide reserves exceeds the Reserve Penalty Factor" of $850/MWh "does not prevent *PJM* from relying on that resource." *Id.* at 48, JA0053. Instead, "to maintain the minimum reserves required in accordance with NERC standards, PJM dispatchers *will* commit all generation, even generation costing above the existing $850/MWh Reserve Penalty Factor," and "that seller will be paid its cost to provide the service—both its offer and lost opportunity cost—as out-of-market uplift." *Id.* at 49, JA0054.[3]

---

[3]    As a definitional matter, "[u]plift refers to out-of-market payments to generation or demand response resources in certain situations to ensure that these resources are appropriately compensated when following PJM's instructions to produce or reduce power. Out-of-market payments are transactions that are exceptions to the usual PJM markets policies; these exceptions are made in order to ensure the reliable operation of the power

13

Thus, the "$850/MWh [price cap] prevents the reserve market clearing price from reflecting the incremental costs of resources needed to meet reserve requirements in shortage or near-shortage conditions." PJM Transmittal 10, JA0015. And "[g]iven that the Reserve Penalty Factor is intended to be the key mechanism for setting and signaling shortage pricing in the PJM region, this is a fundamental flaw." *Id.*

PJM therefore proposed a demand curve that is set at $2,000/MWh up until its minimum reserve requirement is met, and that slopes downward after that point:



PJM Transmittal 65, JA0070.

---

grid." *Understanding Uplift and Out-of-Market Payments*, PJM, perma.cc/URP6-PWFY .

**2.** In May 2020, FERC issued an order holding that PJM had "met its burden" in showing that the existing reserve market design was unjust and unreasonable. May 2020 Order ¶ 97, JA0695. FERC adopted revisions including, among other things, setting downward-sloping Demand Curves to represent the value of reserves procured beyond the minimum requirements (May 2020 Order ¶ 219, JA0747) and increasing the price cap for obtaining minimally required reserves to $2,000/MWh (May 2020 Order ¶ 153, JA0719).

The order recognized that a "significant record" had been developed in the proceeding and that "[t]he vast majority of the comments" agreed that PJM's market design was "unjust and unreasonable and must be revised." May 2020 Order ¶¶ 21, 23, JA0666-0667. In sum, FERC found that PJM's "reserve market is systematically failing to acquire within-market the reserves necessary to operate its system reliably, to yield market prices that reasonably reflect the marginal cost of procuring necessary reserves, and to send appropriate price signals for efficient resource investment." May 2020 Order ¶ 74, JA0687.

Then-Commissioner Glick dissented. *See generally* May 2020 Dissent, JA0800-0815. FERC affirmed its decision in the face of rehearing requests in November 2020. November 2020 Order ¶ 2, JA0817.

### C.    FERC's voluntary remand order

Several parties petitioned for review of the May 2020 order and the November 2020 order in the D.C. Circuit. Rehearing Order ¶ 14, JA0989. While those cases were pending, there was a change of presidential administration, and there were changes to the composition of the Commission. Commissioner Glick was made Chairman.

Without holding a vote or notifying the other Commissioners, Chairman Glick "directed the Solicitor's Office to seek a voluntary remand" of the D.C. Circuit cases. Danly Dissent ¶ 2, JA0921. FERC's Solicitor's Office accordingly filed a motion on August 13, 2021—two weeks before briefing was set to begin—seeking "prompt action" to remand the cases back to the Commission. Motion of Respondent Federal Energy Regulatory Commission, *Am. Mun. Power, Inc. v. FERC*, Nos. 20-1372, 20-1373, 20-1374, 21-1117, at 2 (D.C. Cir. Aug 13, 2021) ("Remand Motion"), JA0885. The Solicitor's Office stated that Chairman Glick had dissented from the orders on review, and that recently confirmed Commissioner Clements had "joined the Commission only in time to vote on the fourth order," a compliance rehearing order dated March 9, 2021. Remand Motion at 2, JA0885. Thus, the motion explained, "[f]urther review of the orders, under the leadership of a new Chairman, has motivated a reconsideration of the Commission's prior determination." *Id.*

16

The motion also listed one other reason to "reassess" the orders: A recent D.C. Circuit case had remanded without vacatur a case for FERC to explain more adequately its approval of a 10% adder (*see Delaware Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 469 (D.C. Cir. 2021)), and that case "could have a bearing on the Commission orders on review here" because they "also involve application of a 10% adder for certain resources in PJM," Remand Motion at 2-3, JA0885-0886. Before the cases were briefed, the D.C. Circuit granted the motion for voluntary remand. Order, *Am. Mun. Power, Inc. v. FERC*, No. 20-1372 (D.C. Cir. Aug. 23, 2021), JA0889-0890.

In December 2021, FERC issued an order reversing its prior holdings with respect to the Reserve Penalty Factors and ORDCs ("Remand Order"). In its order, FERC declined requests to reopen the record or accept additional briefing on the issues. Remand Order ¶ 23, JA0901-0902. Then, based on the same record that was before it in May 2020, the Commission "revise[d]" its "findings regarding several aspects of [PJM's] reserve market provisions in the PJM Tariff and Operating Agreement." Remand Order ¶ 25, JA0902. FERC found that "PJM failed to demonstrate that the currently effective Reserve Penalty Factors and two-step [vertical] ORDCs are unjust and unreasonable." *Id.*, JA0902-0903. Thus, as a result of the Commission's 180-degree change in position, the original price caps and ORDC curve shapes remained in force.

17

Commissioner Danly dissented, arguing that the Remand Order was procedurally and substantively defective. He questioned the authority and propriety of the Chairman's unilateral action to request a voluntary remand, along with the Chairman's abolition of FERC's "longstanding" practice of voting on "major litigation decisions." Danly Dissent ¶¶ 3-4, JA0922. He challenged the stated grounds for seeking the remand, noting that a leadership change was "not a justification" and that the 10% adder issue was "wholly pretextual," as the revisions "go far beyond th[at] specific issue." Danly Dissent ¶ 2 & n.9, JA0921, JA0923. And he objected to FERC's abandonment of its prior conclusions based on "exactly the same" record and stated that FERC did so only "by ignoring extensive record evidence." Danly Dissent ¶¶ 9, 11, JA0924-0925.

P3 and EPSA sought rehearing on the grounds that the Remand Order undermined regulatory stability and was arbitrary and capricious. The rehearing request also echoed Commissioner Danly's concerns about the legality of Chairman Glick's unilateral remand of a majority order from which he had dissented. Rejecting these arguments, FERC "continue[d] to reach the same result." Rehearing Order ¶ 3, JA0981.[4]

---

[4]   Since the events leading to this petition, the makeup of the Commission has changed once again: Chairman Glick's term expired and he was not renominated for another term, and Commissioner Willie Phillips also joined FERC. *See generally Meet the Commissioners,* FERC (Jan. 17, 2023),

## SUMMARY OF THE ARGUMENT

FERC's orders are unlawful, and must be set aside, for a whole host of reasons.

**I.** First, the Chairman's unilateral directive to move for voluntary remand exceeded his statutory authority because, by statute, actions of the Commission must be taken only upon a majority vote of a quorum of Commissioners. 42 U.S.C. § 7171(e). The Chairman's administrative authority to act on behalf of the Commission does not embrace major litigation decisions (*id.* § 7171(c), (i))—particularly a decision to claw back a prior, final majority order of the Commission from which the Chairman himself dissented, thus enabling its rescission. If the Commission wishes to change a previous majority decision, there is a statutory mechanism to do so—but, by design, it imposes a heavy substantive burden that the Commission has not attempted to shoulder here. The Chairman's action is therefore *ultra vires* and renders the ensuing orders that reversed FERC's prior final decision a legal nullity.

**II.** FERC's orders are also arbitrary and capricious on multiple independent grounds.

---

perma.cc/BD5T-Q3QP. The Commission thus currently consists of four Commissioners, plus an unfilled seat.

**A.** To begin, FERC's decision to reverse substantial portions of its prior final orders was arbitrary and capricious because FERC failed to consider regulatory stability, which the Commission itself has previously identified as an important aspect of energy and ancillary services market design. Consistency in agency decisionmaking is essential to the health of a regulated industry, particularly when it comes to fundamental aspects of a market design, and even more especially in a capital-intensive industry requiring long-term planning like power generation. Not only did FERC upset industry expectations and create uncertainty as to future developments, but the Commission also failed to address any of these concerns in its Remand Order and Rehearing Order. That omission was arbitrary and capricious.

**B.** FERC's reinstatement of the vertical shape of PJM's reserves Demand Curve was also a failure of reasoned decisionmaking. FERC's prior order explained the abundant evidence showing that reserves continue to have value, and indeed are necessary, after the bare minimum amount has been procured. Significant operational uncertainties require PJM operators to bias calculations of the quantity of reserves needed to maintain system reliability. Those same uncertainties require operators to procure reserves outside the market. The stepwise shape of the pre-2020 demand curve does not accommodate these realities, instead suggesting that additional

reserves beyond the minimum requirements have no value. While FERC acknowledged these issues in May 2020, it changed course in December 2021 without an adequate explanation of why the same record dictated the opposite conclusion from the one FERC had reached earlier.

**C.** Similarly, FERC's reinstatement of the lower price caps for reserves was arbitrary and capricious for lack of reasoned decisionmaking. The maximum reserves price of $850/MWh may have been an acceptable compromise when it was initially proposed in 2012, but the 2016 increase in the energy price cap from $1,000/MWh to $2,000/MWh drastically raised the potential opportunity costs of committing reserves instead of selling energy. FERC explained this development in its May 2020 Order when it held that the reserves price cap had become unreasonably low. The Remand Order failed to justify a different outcome. For this reason, too, FERC's action must be set aside.

## STANDARD OF REVIEW

This Court reviews "the Commission's orders under the arbitrary-and-capricious standard" but gives "fresh review to questions of law." *MISO Transmission Owners v. FERC*, 860 F.3d 837, 841 (6th Cir. 2017); *Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021) (questions of law reviewed *de novo*).

"An agency decision is arbitrary and capricious if the agency fails to examine relevant evidence or articulate a satisfactory explanation for the decision." *Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006). Courts review whether "the Commission engaged in reasoned decisionmaking— that it weighed competing views," made its decision "with adequate support in the record, and intelligibly explained the reasons for making that choice." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 295 (2016).

Moreover, when an agency changes course from a prior position, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by [its] prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And the Court must also set aside an agency action in contravention of the governing statute. *See, e.g.*, *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("The power of executing the laws … does not include a power to revise clear statutory terms.").

## ARGUMENT

The orders on review should be set aside for two reasons. First, the Chairman lacked statutory authority to seek a voluntary remand without FERC acting by a majority vote. Second, the orders are arbitrary and capricious because they fail to consider regulatory stability (a key factor under FERC's own precedents); fail to reflect reasoned decisionmaking with

22

respect to the shape of the Demand Curve, and similarly lack reasoned decisionmaking with respect to the reserve price cap.

## I.   The Chairman's request for voluntary remand exceeded statutory authority.

To begin, the Chairman's unilateral decision to seek a voluntary remand, without the consent of the Commission and a majority vote, exceeded his statutory authority.

### A.   The Chairman lacks the power to unilaterally overturn a Commission decision.

**1.** Under the Department of Energy Organization Act, "[a]ctions of the Commission shall be determined by a majority vote of the members present." 42 U.S.C. § 7171(e). The Act goes on to specify that "a quorum for the transaction of business shall consist of at least three members" and that "[e]ach member of the Commission, including the Chairman, shall have one vote." *Id.*

This clear statutory principle—that a majority vote of the Commission is required to take official action—is in keeping with the "'almost universally accepted common-law rule' that only a 'majority of a collective body is empowered to act for the body.'" *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016) (quoting *FTC v. Flotill Prods., Inc.*, 389 U.S. 179, 183 (1967)).

23

Thus, "[c]ollective action is prerequisite to any alteration of a preexisting order." *Pub. Serv. Comm'n of N.Y. v. FPC*, 543 F.2d 757, 776 (D.C. Cir. 1974) (applying this "rule of the common law" to the Federal Power Commission, the predecessor agency to FERC, "[t]here being no statutory specification to the contrary"). That is, "a decision by a majority vote duly taken" is "the only authorized means" to "a decision to undo a prior decision." *Id.* at 777. After all, "[i]f an agency proceeding could be reopened by the unilateral action of a [single] member," that would "wreak havoc on the stability of the agency's decision." *Id.*

Here, the Chairman unilaterally decided to reopen agency proceedings in order to modify a final FERC decision. As Commissioner Danly wrote in his dissent, "the Chairman directed the Solicitor's Office to seek a voluntary remand of this proceeding without seeking the consent of the Commission, or even notifying his colleagues of his decision to do so." Danly Dissent ¶ 2, JA0921. Despite the Solicitor's representations that the "Commission" requested the voluntary remand, it was the Chairman's sole decision to make such request. The Chairman "unilaterally subjected validly-issued, final Commission orders to extensive revisions." *Id.* ¶ 3, JA0922.

The purpose and effect of the Chairman's "unilateral action" to reopen proceedings was "to undo a prior decision." *Pub. Serv. Comm'n of N.Y.*, 543

24

F.2d at 777. As the motion for remand stated, further review of FERC's initial orders "under the leadership of a new Chairman" "motivated a reconsideration of the Commission's prior determination." Remand Motion at 2, JA0885. Acting alone, the Chairman did not possess the "authorized means" to lawfully effectuate a "decision to undo a prior decision." *Pub. Serv. Comm'n of N.Y.*, 543 F.2d at 777.

**2.** In the Rehearing Order, FERC asserted that the voluntary remand request fell "within the Chairman's responsibilities." Rehearing Order ¶ 107, JA1055. But the Chairman's authority to act "on behalf of the Commission" is limited to ministerial and routine functions of "executive and administrative operation." 42 U.S.C. § 7171(c). The statute lists five such functions, all of which relate to personnel decisions: (1) the "appointment and employment of hearing examiners," (2) the "selection and appointment" of FERC personnel, (3) the "supervision" of FERC personnel (but not of the personnel on other commissioners' personal staffs), (4) the "distribution of business among personnel" and among FERC administrative units, and (5) the "procurement of services of experts and consultants." And while the Chairman may designate litigating attorneys, such attorneys must "appear for" and "represent *the Commission*," not the Chairman's personal views. *Id.* § 7171(i) (emphasis added).

25

Plainly, these narrowly constrained categories of "executive and administrative" authorities do not empower the Chairman to reopen an otherwise-final Commission order—something even the full Commission lacks the power to do, absent the intervention of a court (*see* pages 30-36, *infra*)—and bring it back before FERC for modification. *See* Danly Dissent ¶ 4, JA0922 ("I question whether the DOE Organization Act either intends or contemplates such unilateral authority asserted by the Chairman to request a voluntary remand, in effect nullifying the votes of a majority of the Commissioners that approved the orders at issue."); *see also* Statement of James P. Danly, FERC Docket No. ER21-2582 (Aug. 26, 2022) (Commissioner Danly's later statement in another case, concluding that "[i]t at least runs contrary to the spirit of the DOE Organization Act, and may well violate it, for the Chairman to employ instrumentalities of the Commission, like the Solicitor's Office, to advance litigation positions in pursuit of his own particular goals when they are not the position of the Commission.") ("Danly Statement"), JA1064. Nothing in the Act suggests that the Chairman's decision was within the scope of his authority.

In finding "no statutory requirement for either internal polling or a majority vote" for major litigation decisions, FERC gets it precisely backwards. *See* Rehearing Order ¶ 107 n.329, JA1055 (asserting that "EPSA/P3 … identify no [such] statutory requirement"). First, there *is* such

26

a statutory requirement: The plain command that "[a]ctions of the Commission shall be determined by a majority vote of the members present" (42 U.S.C. § 7171(e))—particularly when read together with the statute's closely delimited exceptions for ministerial actions that may be taken by the Chairman unilaterally (*id.* § 7171(i))—is a strong indication that the Chairman's power-grab here was without statutory basis. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-617 (1980)).

Second, even putting this statutory text to the side, it is the "'almost universally accepted common-law rule' that only a 'majority of a collective body is empowered to act for the body.'" *Pub. Citizen*, 839 F.3d at 1169. Thus, in the absence of some "statutory specification to the contrary," that common-law principle supplies "the governing rule"—just as the D.C. Circuit explicitly held with respect to FERC's predecessor agency. *Pub. Serv. Comm'n of N.Y.*, 543 F.2d at 291-292; *see also id.* at 293 ("Once made, [an agency's] decision remains the decision of the body, *immune from alteration* save by another collective effort of that body.") (emphasis added).

27

And third, FERC's effort to shift the burden to the petitioners to find a "statutory requirement for either internal polling or a majority vote" (Rehearing Order ¶ 107 n.329, JA1055) puts the cart before the horse as a matter of first principles. "An agency, after all, literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Kentucky v. Yellen*, 54 F.4th 325, 345 (6th Cir. 2022) (quoting *Fed. Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1649 (2022)); *see also, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 665 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). It is therefore *the agency* that must find in the statute some affirmative *authorization* for the Chairman to unilaterally override a majority-enacted Commission order, if he is to be so empowered. FERC's rehearing order does not—and cannot—locate any such grant of authority, and the result is that FERC's Chairman is powerless to take the action that then-Chairman Glick attempted here.

**3.** FERC may argue that the Remand Motion was proper because it was unopposed.[5] First, the fact that a purported agency action may have been unopposed at the time taken cannot supply power that the agency (or

---

[5]  P3 was an intervenor in the D.C. Circuit litigation and did not oppose remand. EPSA was not a party.

one of its members) in fact lacks. *Cf., e.g.*, *Kentucky*, 54 F.4th at 345 ("An agency, after all, literally has no power to act … unless and until Congress authorizes it to do so by statute.").

Moreover, such an argument would overlook the fact that, at the time, the parties and intervenors did not *know* that the motion did not represent an "institutional decision[]." *Pub. Serv. Comm'n of N.Y.*, 543 F.2d at 776. Indeed, the Remand Motion was styled as a "Motion *of* Respondent Federal Energy Regulatory Commission" and stated that "the *Commission* requests, without opposition" a remand. Remand Motion at 1, 3, JA0884, JA0886 (emphasis added). The fact that it was Chairman Glick acting alone—and not the Commission as a body—only came out later. And, as Commissioner Danly observed, Chairman Glick's decision to act unilaterally departed from "the Commission's longstanding tradition of polling the Commissioners for major litigation decisions." Danly Dissent ¶ 3, JA0922.

What is more, the Remand Motion implied that remand would be limited in scope, considering only the narrow issue of FERC's approval of a 10% adder. Remand Motion at 2-3, JA0885-0886; *see* pages 16-17, *supra*.[6]

---

[6]   Ironically, while that was the only specific issue identified in the Remand Motion as warranting reexamination, the Remand Order did not address that issue at all, prompting one party to seek clarification because the Remand Order "does not respond directly" to its request concerning that issue. Clarification Request at 2, JA0932.

The defects in FERC's request for voluntary remand therefore only became evident after the motion had been granted, and Commissioner Danly issued his dissent. Once those defects came to light, they were glaring.

Because the request for voluntary remand was not a statutorily authorized "[a]ction[] of the Commission," 42 U.S.C. § 7171(e), it is a "mere nullity," and the output of the administrative process set in motion by that *ultra vires* action must be set aside, *Dixon v. United States*, 381 U.S. 68, 74 (1965).

**4.** Finally, the fundamental structure of the Federal Power Act, which intentionally makes it difficult for even *the whole Commission* to undo its past actions, renders it particularly important to enforce the statute's limitations on the Chairman's claimed power to unilaterally reopen past Commission actions for reconsideration.

FERC itself generally has no power to simply reopen and amend its prior orders after they become final. *See generally Hirschey v. FERC*, 701 F.2d 215, 217-218 (D.C. Cir. 1983). If judicial review is sought, the Commission may "modify" an "order made or issued by it"—but only "[u]ntil the record … [is] filed in a court of appeals." 16 U.S.C. § 825*l*(a). Once the record is filed, the Commission loses the "power to correct [its] order," as jurisdiction has passed to the court. *Hirschey*, 701 F.2d at 218; *see* 16 U.S.C. § 825*l*(b) ("jurisdiction" becomes "exclusive" in the court of appeals "upon

30

the filing of the record"). And if no one seeks judicial review, once "the time for judicial review expires … the FERC order becomes final, and FERC can no longer modify the order." *Valero Interstate Transmission Co. v. FERC*, 903 F.2d 364, 368 (5th Cir. 1990);[7] *accord Hirschey*, 701 F.2d at 218.

Thus generally barred from simply reopening and modifying its own orders, the Commission instead must utilize a specific "statutory mechanism … [in order] to revisit tariff provisions that it has previously established": Section 206 of the Federal Power Act (16 U.S.C. § 824e), which "has a higher burden" than does adopting a rate in the first place. Danly Dissent ¶¶ 5-6, JA0923-0924. Specifically, "[t]he first step of section 206 requires a demonstration that the prevailing rate is *not* just and reasonable before the Commission can then move to step two's establishment of a replacement rate. This requirement biases Commission action toward preservation of prevailing rates absent a heightened showing." *Id.* ¶ 6, JA0923; *see* 16 U.S.C. § 824e(a).[8]

---

[7]    *Valero* concerned the judicial review provisions of the Natural Gas Act, which are materially identical to those of the Federal Power Act. "Courts … follow [the] established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." *In re Ultra Petroleum Corp.*, 28 F.4th 629, 636 n.1 (5th Cir. 2022) (quotation marks omitted).

[8]    *See also* Danly Dissent ¶ 7, JA0924 ("The inertia created by the heightened 206 standard enhances stability and encourages the development of the expectations that utilities (especially in the organized

The Chairman's *ultra vires* action improperly enabled FERC to circumvent the strictures of Section 206 of the FPA. Absent the unlawfully requested remand, the Commission would have had no power to simply alter its order without following the procedures of Section 206. And had the Commission utilized the Section 206 procedure, it would not have been enough that the Commission changed its mind and no longer considered the vertical ORDCs and the $850/MWh Reserve Penalty Factors to be unjust and unreasonable—*i.e.*, that it now views those prior ORDCs and Reserve Penalty Factors as just and reasonable.

Instead, FERC would have been required first to find that the downward-sloping ORDCs and the $2,000/MWh Reserve Penalty Factors approved in the May 2020 Order were themselves *un*just and *un*reasonable. Only then would the Commission have been empowered to establish a just and reasonable replacement rate. *See, e.g.*, *Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017) (describing FERC's "dual burden under section 206," which makes "a finding that an existing rate is unjust and unreasonable … the 'condition precedent' to FERC's exercise of its section

---

markets) must have to conduct business in a capital-intensive industry. Unilateral action taken by the Chairman alone not only circumvents the statutorily-prescribed mechanism by which the Commission is to revisit its earlier decisions, but it also creates the kind of uncertainty that chills investment and increases costs to market participants and, ultimately, ratepayers.").

206 authority to change that rate") (quoting *Sierra Pac. Power Co. v. FPC*, 350 U.S. 348, 353 (1956)). The significance of skipping the first step is enormous, because it is well settled that "there is no single just and reasonable rate." *Complex Consol. Edison Co. of N.Y., Inc. v. FERC*, 165 F.3d 992, 1002 (D.C. Cir. 1999); *see also, e.g.*, *Me. Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 471 (D.C. Cir. 2008) ("[T]here is not a single 'just and reasonable rate' but rather a zone of rates that are just and reasonable; a just and reasonable rate is one that falls within that zone.") (collecting authorities), *rev'd on other grounds*, 558 U.S. 165 (2010). That being the case, it does not follow from the Commission's finding that the old ORDCs and price cap are just and reasonable that those approved in the May 2020 Order are unjust and unreasonable.

It is therefore no defense for FERC to assert that the "motion for voluntary remand" *itself* did not "overturn the decisions previously reached in a duly-voted Commission order," instead merely "return[ing] jurisdiction to the Commission," which then, "acting as a body, [] improve[d] the decision to … better satisfy the Commission's substantive responsibilities." Rehearing Order ¶ 107, JA1055. First, as the D.C. Circuit has explained, "agencies are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Merck & Co., Inc. v. HHS*, 962 F.3d 531, 536

33

(D.C. Cir. 2020). So if the voluntary remand—without which, the Commission would have lacked jurisdiction to modify its prior order—was outside the Chairman's power, the Commission's action on remand cannot save it in any event.

And that principle has particular force when the Commission on remand applied a different, more lenient substantive standard than it would have had to apply under Section 206, absent the unlawful remand request. That is, the Remand Order did *not* find that the ORDCs approved by the May 2020 Order were unjust and unreasonable, as would have been required for the Commission to overturn them under Section 206. *See generally* Remand Order, JA0891-0919. Instead, it merely found that the prior ORDCs were *not* unjust and unreasonable—a much lower showing, given the "zone of reasonableness" concept noted above. *Me. Pub. Utils. Comm'n*, 520 F.3d at 471; *see* Remand Order ¶ 25, JA0902-0903.

Indeed, theoretically, *both* sets of ORDCs could simultaneously be just and reasonable, and it is far from clear that even the Commission on remand, with its "composition more to [Chairman Glick's] liking," would have had the votes to find PJM's new ORDC's affirmatively unjust and unreasonable under Section 206. Danly Dissent ¶ 5, JA0923; *compare* May 2020 Dissent ¶ 1, JA0800 (arguing that "[t]oday's order … fails to show that the existing rate is unjust and unreasonable *or* that the replacement rate is

34

just and reasonable") (emphasis added); *with* Remand Order ¶ 25, JA0902-0903 (finding only that "PJM failed to demonstrate that the currently effective [ORDCs] are unjust and unreasonable").[9]

The fact that the newly reconstituted Commission on remand took a majority vote to upend its prior decision thus cannot rehabilitate or render harmless the *ultra vires* action taken by Chairman Glick to set the administrative procedure in motion. The Court must vacate the output of the Commission's unlawful procedure: the orders challenged here.

## B. If interpreted to authorize the Chairman's action, the Federal Power Act would be unconstitutional.

If the statutory text, common-law principles, and FERC's limited authority as a creature of statute were not enough, constitutional concerns similarly counsel against interpreting the Act to empower FERC's Chairman to unilaterally reopen an otherwise final decision. *See, e.g.*, *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 549 (6th Cir. 2012) (relying upon "the 'cardinal principle of statutory interpretation that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided'")

---

[9]    As we describe below (*see infra,* Sections II.B & II.C), the Commission's determination on remand that the old ORDCs were just and reasonable was in fact arbitrary and capricious.

(quoting *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)) (alteration incorporated); *United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1622 (2021) ("Courts should indeed construe statutes to avoid not only the conclusion that they are unconstitutional, but also grave doubts upon that score.") (quotation marks omitted; alteration incorporated).

**a.** Article II of the Constitution provides that "[t]he executive Power shall be vested in a President." U.S. Const. Art. II, § 1, cl. 1. While the President may delegate the executive power to lesser officers who will "assist the supreme Magistrate in discharging the duties of his trust" (30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)), such officers must ordinarily be removable at will by the President. *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986).

The Supreme Court has expounded a narrow exception to this otherwise "unrestricted removal power." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2198 (2020). "In short," the Constitution permits Congress to "give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [can be] said not to exercise any executive power." *Id.* at 2199 (citing *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)).

In its ordinary functions, FERC at least arguably meets these criteria. Like the agency whose constitutionality was upheld in *Humphrey's*

36

*Executor*, FERC is composed of five members, each of whom is entitled to a single vote, and no more than three of whom can be from the same political party. *See* 42 U.S.C. § 7171(b); *Humphrey's Executor*, 295 U.S. at 624. The Commission oversees a "'complex and highly technical' regulatory program" requiring "particular substantive expertise and specialized experience." *Helen Mining Co. v. Elliott*, 859 F.3d 226, 238 (3d Cir. 2017) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *accord FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 295 (2016); *Natural Gas Clearinghouse v. FERC*, 965 F.2d 1066, 1070 (D.C. Cir. 1992). And "the Commissioners' staggered, [five]-year terms enable[] the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Seila Law*, 140 S. Ct. at 2199 (quoting *Humphrey's Executor*, 295 U.S. at 624); *see* 42 U.S.C. § 7171(b).

Thus, despite the fact that its "Members … may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office" (42 U.S.C. § 7171(b)), the Commission's structure appears constitutional so long as *Humphrey's Executor* remains good law.

**b.** By structuring the agency such that all "[a]ctions of the Commission shall be determined by a majority vote" of a quorum, Congress thus plainly intended to structure FERC in accordance with *Humphrey's Executor*'s safe harbor for multimember agencies. 42 U.S.C. § 7171(e). But

37

the former Chairman's abuse of his administrative authorities threatens to cast FERC into stormier seas.

As noted above, the Chairman is "responsible on behalf of the Commission for the executive and administrative operation of the Commission." 42 U.S.C. § 7171(c); *see* Danly Statement, *supra*, at 4 n.18. When he confines himself to the ministerial duties set forth in the statute— payroll, supervision of personnel, and the like—there is no doubt that he can properly act with unilateral authority since such actions do not infringe on the "executive Power." U.S. Const. Art. II, § 1, cl. 1; *see Morrison v. Olson*, 487 U.S. 654, 681 (1988) (holding that "powers granted" which "are themselves essentially ministerial" "are not inherently 'Executive'").

But these administrative responsibilities stand in stark contrast with the "core executive power" that the Chairman has attempted to unilaterally wield here. *Seila Law*, 140 S. Ct. at 2200. The Executive Power unquestionably includes power over key, substantive litigation decisions of components of the Executive Branch. *See id*; *see also Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 472 (D.C. Cir. 1982) ("Although FERC is substantially independent of the Executive, it nonetheless performs executive functions."). When a Commission majority has adopted a position, the Solicitor's authority to defend that position on appeal is obvious. But when the Chairman attempts to unilaterally reopen a final,

38

majority Commission decision by means of the Solicitor's office, he cannot seek refuge in *Humphrey's Executor*'s carveout for multimember bodies.

Nor do former Chairman Glick's actions fall within *Morrison*'s exceptions for exercises of "essentially ministerial" functions exercised by officers "with limited jurisdiction and tenure and lacking policymaking or significant administrative authority." 487 U.S. at 691. First, and most obviously, "[e]veryone agrees" that the Chairman "is not an inferior officer, and [his] duties are far from limited." *Seila Law*, 140 S. Ct. at 2200. But more to the point, directing an agency's legal and policy positions in litigation is in no way "ministerial." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498 (1866) ("A ministerial duty … is one in respect to which nothing is left to discretion. It is a simple, definite duty … imposed by law."); *Nealon v. Davis*, 18 F.2d 175, 176 (D.C. Cir. 1927) ("A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of his own judgment upon the propriety of the act being done."). Thus, when the Chairman unilaterally directs the Solicitor to request that a court use its Article III power to undo a valid Commission order, he does so in violation of Article II.

By directing the filing of the motion for voluntary remand in the D.C. Circuit, the Chairman thus exceeded his constitutional authority. In

unilaterally attempting to reopen and thus nullify the Commission's preexisting order, the Chairman (through the Solicitor and General Counsel) plainly "wield[s] power alone rather than as members of a board or commission." *Seila Law*, 140 S. Ct. at 2201. If, contrary to our statutory argument, the Chairman in fact has the authority to direct the filing of a motion that would have such a substantive effect on binding Commission decisions, then the Chairman is both subject only to good cause removal (42 U.S.C. § 7171(b)) and capable of unilaterally wielding the executive power (*Morrison*, 487 U.S. at 681). That is precisely what the Supreme Court recently found constitutionally intolerable in *Seila Law*. 140 S. Ct. at 2201.

The power to use the Solicitor's office (and the federal courts) to unilaterally reopen a Commission order from which Chairman Glick was the lone dissenter is obviously inconsistent with his obligation to act "on behalf of the Commission" in his supervision of the agency's counsel. 42 U.S.C. § 7171(c). Even more fundamentally, a statutory scheme that allowed the Chairman to exercise such unilateral authority to "nullify[] the votes of a majority of the Commissioners" by reopening final orders (Danly Dissent ¶ 4, JA0922)—and thus to dictate which Commission decisions may remain binding on regulated parties—would run afoul of the principles thoroughly and recently expounded in *Seila Law*. 140 S. Ct. at 2203 (holding that Congress may not "vest[] significant governmental power in the hands

40

of a single individual accountable to no one"). And such a scheme would undermine Congress's attempts to ensure nonpartisan, expert decisionmaking. *Id.* at 2200 (holding that a "single [Commissioner] … cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle") (quoting *Humphrey's Executor*, 295 U.S. at 624).

To avoid this grave constitutional question, the Court should hold that the Chairman's statutory powers do not authorize him to unilaterally claw back a duly issued Commission order by means of the courts. *See Discount Tobacco City*, 674 F.3d at 549. Otherwise, the Court should hold that the Commission's action is infected by constitutional error, and thus must be reversed on that basis.

## II.   FERC's orders on voluntary remand were arbitrary and capricious.

Quite apart from the *ultra vires* nature of the administrative actions that led to the Commission orders challenged here, those orders are arbitrary and capricious in both procedure and substance. First, in reversing its prior decision without receiving additional briefing or reopening the record, FERC disregarded the importance of regulatory stability—a factor the Commission has previously cited as critical—and disregarded the parties' arguments raising this important factor. And second, neither FERC's reimposition of the vertical shape of the demand

curve nor its decision to return the reserves price cap to the level it had previously found to be unjustly and unreasonably low satisfies the APA's fundamental requirement of reasoned decisionmaking.

### A.    FERC's reversal of its prior order based on no new evidence was arbitrary and capricious because it disregarded regulatory stability.

**1.** In May 2020, after thoroughly reviewing a lengthy record, FERC rightly concluded that the rules for PJM's operating reserves market needed revision. It reaffirmed that decision in November 2020 when it addressed the arguments raised on rehearing. That should have been the end of the matter, subject only to the D.C. Circuit's arbitrary-and-capricious review or a new FERC proceeding under FPA Section 206 (16 U.S.C. § 824e), which would require a finding that the new market design was unjust and unreasonable. *See* pages 30-36, *supra*. But prompted by the Chairman's capricious decision to reconsider those orders, FERC reversed them without considering the need for regulatory stability.

An agency decision is arbitrary and capricious and must be set aside if it "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *accord, e.g.*, *Oakbrook Land Holdings, LLC v. Comm'r of Internal Rev.*, 28 F.4th 700, 720 (6th Cir. 2022) (same). By upending its previous, majority-voted decision based solely on "the leadership of a new Chairman" (Remand Motion 2), FERC has upset the market expectations engendered

42

by that prior decision. *See* Danly Dissent ¶ 1, JA0921 ("It is particularly inappropriate for the Commission to take this unexpected action … when reliance interests have solidified around the Commission's prior order.").

The Commission has long "emphasized that it considers stability and regulatory certainty an important issue in its decision-making process." *Rail Splitter Wind Farm, LLC v. Ameren Servs. Co.*, 142 FERC ¶ 61,047 at P 31 (2013); *see also Nevada Power Co. v. Duke Energy Trading & Mktg., L.L.C.*, 99 FERC ¶ 61,047 at 61,190 (2002) ("Competitive power markets simply cannot attract the capital needed to build adequate generating infrastructure without regulatory certainty…."). And it has stated that it will "strive[] to provide regulatory certainty through consistent approaches and actions." FERC, *About FERC*, perma.cc/V37U-NN7Z. As Chairman Glick himself stated in the return on equity context, "[a]ll approaches to setting ROEs have their shortcomings, but the worst outcome by far is to continually fiddle with those approaches, undermining the certainty and predictability that help transmission owners make long-term investments." *Association of Businesses Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 173 FERC ¶ 61,159 (2020), Concurring and Dissenting Statement at P 10. Such continual tweaking fails to produce a "a stable investment climate for transmission owners." *Id.*

43

Regulatory stability is even more critical in the market rules context. "Power markets simply cannot function when the rules constantly change, and for that, the blame lies squarely with the Commission." *Independent Market Monitor for PJM v. PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,022, Concurring Statement at P 1 (2022) (Danly, Comm'r, concurring). FERC's statutory mission "to encourage the orderly development of plentiful supplies of electricity … at reasonable prices" (*NAACP v. FPC*, 425 U.S. 662, 670 (1976)), depends on substantial private investment that relies on stable market structures. *See, e.g.*, Danly Dissent ¶ 7, JA0924 (noting that "stability … encourages the development of the expectations that utilities … must have to conduct business in a capital-intensive industry").

FERC wholly disregarded this problem when it reversed a two-year-old decision that it had reaffirmed on rehearing only a year earlier. Indeed, there is no reference whatsoever to regulatory stability in the Remand Order. *See generally* Remand Order, JA0891-0919. That utter failure "to consider" an "aspect of the problem" (*State Farm*, 463 U.S. at 43) that FERC itself has previously described as "an important issue in its decision-making process" (*Rail Splitter Wind Farm*, 142 FERC ¶ 61,047 at P 31) is enough on its own to render FERC's order arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

Put slightly differently, the Commission must consider its own relevant precedent as part of its obligation to engage in reasoned decisionmaking. *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) ("Reasoned decisionmaking necessarily requires consideration of relevant precedent."); *see also, e.g.*, *Ohio Fast Freight, Inc. v. United States*, 574 F.2d 316, 319 (6th Cir. 1978 ("It is axiomatic that an administrative agency either must conform with its own precedents or explain its departure from them."). Yet in the orders here, FERC disregarded its own longstanding "emphasi[s] that it considers stability and regulatory certainty an important issue in its decision-making process" (*Rail Splitter*, 142 FERC ¶ 61,047 at P 31) when it reversed its own earlier decision while apparently paying no heed whatsoever to regulatory stability.

Of course, the Commission remains "free to discard precedents or practices it no longer believes correct." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004) (per curiam). But "[i]f an agency decides to change course" it must "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Id.* (quotation marks omitted). FERC has not done so here, and its action is therefore unlawful under this doctrinal framework, as well.

**2.** P3 and EPSA raised this complete failing by the Commission during the rehearing process below. *See* P3/EPSA Rehearing Request, at 2, JA0946. And while the Commission's Rehearing Order acknowledged petitioners' concerns on this score (Rehearing Order ¶ 103, JA1052-1053), it did not actually address or respond to them other than to state that "the Remand Order was duly voted on by a quorum of the Commission" and therefore "there is no basis on which to deem the Remand Order unlawful based on the manner in which the motion for voluntary remand was developed" (*id.* ¶ 108, JA1056).

That is obviously non-responsive: As assertion that there is nothing wrong with "the manner in which the motion for voluntary remand was developed" (Rehearing Order ¶ 108, JA1056) is completely irrelevant to an objection that FERC's decision on remand is *substantively* flawed for failure to consider an important aspect of the problem. *Cf., e.g.*, *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) ("[N]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking" and does not satisfy the agency's APA obligations) (quoting *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020)).

Indeed, as the D.C. Circuit put it in a prior case, the Commission here "not only failed to provide an adequate response to [petitioners'] argument, it failed to take seriously its responsibility to respond at all," rendering its

decision arbitrary and capricious. *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998); *see also id.* ("[I]t most emphatically remains the duty of this court to ensure that an agency engage the arguments raised before it—that it conduct a process of *reasoned* decisionmaking.") (quoting *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1303 (D.C. Cir. 1992)); *New England Power Co. v. FERC*, 533 F.3d 55, 60-61 (1st Cir. 2008) (vacating and remanding FERC order because, "[a]lthough [the petitioner] presented arguments … FERC did not address those arguments or provide an adequate response to them"); *cf., e.g.*, *Oakbrook Land Holdings*, 28 F.4th at 720 ("[A]n agency must respond to comments that can be thought to challenge a fundamental premise underlying the proposed agency decision.") (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019)).

The Commission's orders here are thus doubly defective: They failed to consider an important aspect of the problem in the first instance, *and* they compounded that error by failing to respond adequately (or at all) to petitioners' argument pointing out the original defect.[10] Those orders are therefore invalid under the APA and must be set aside.

_____

[10]  To the extent Commissioner Danly's dissent also appears to raise the regulatory stability objection (*see* Danly Dissent ¶ 1, JA0921), the failure to respond to the dissent constitutes a third APA violation. *See, e.g.*, *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 20 (D.C. Cir. 2010) ("[W]hile FERC is not

## B.  FERC's reversion to a vertical Demand Curve was arbitrary and capricious.

As a substantive matter, FERC's decision to reverse its earlier findings that the vertical Demand Curve was unjust and unreasonable was also arbitrary and capricious.

**1.** Agency action is arbitrary and capricious when the agency fails to engage in "reasoned decisionmaking." *Louisville Gas*, 988 F.3d at 846. To engage in reasoned decisionmaking, an agency "must 'examine the relevant data and articulate a satisfactory explanation for [its] action including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983)). A court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43.

Beyond this baseline standard, an agency "changing position" must "show that there are good reasons" for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And when an agency's new decision "rests upon factual findings that contradict those which underlay its prior policy," "it must" provide "a more detailed justification" than what would

---

required to agree with arguments raised by a dissenting Commissioner … it must, at a minimum, acknowledge and consider them.").

normally suffice. *Id.* In such cases, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," and "[i]t would be arbitrary or capricious to ignore such matters." *Id.*; *see Louisville Gas*, 988 F.3d at 848 n.2 (where FERC "articulated inconsistent views in the Order and Rehearing Order, it had an obligation to explain the change").

Here, the Remand Order "rest[ed] upon factual findings that contradict" those in the May 2020 Order. *Fox Television*, 556 U.S. at 515. As the May 2020 Order stated, the "findings detailed herein" were based on a "significant record"—indeed, PJM's transmittal letter was supported by testimony from several experts, and the "vast majority" of comments agreed that PJM's current market design was unjust and unreasonable. May 2020 Order ¶¶ 21, 23, JA0666-0667.

As relevant here, FERC had found that the Demand Curve's vertical shape—which reduced reserve prices to $300/MWh once the required minimum quantity of reserves was obtained, and then to $0/MWh for any reserves procured beyond 190 MW after the minimum—did not reflect the actual value of additional reserves, and therefore was unjust and unreasonable. This was because PJM operators must procure reserves that "far exceed" the minimum reserve requirements to guarantee system reliability. *Id.* ¶ 77, JA0688. Such reserves are not worthless.

49

As FERC explained, because PJM procures reserves in advance of each operating interval, operators must rely on software-assisted forecasts in calculating the quantities of needed reserves. FERC found that compared to other system operators, PJM faces an exceptionally high degree of uncertainty in making those forecasts; the uniquely "large size of its system" contributes to greater "load forecast error, forced outages, solar forecast error, and wind forecast error." *Id.* ¶ 79, JA0689.

PJM operators address this "significant operational uncertainty" in two ways: "biasing the inputs to market software"—that is, manually adjusting the level of energy demand input into the relevant calculations— and "procur[ing] reserves outside the market." *Id.* ¶¶ 79-80, JA0689.  In the May 2020 Order, FERC found that such biasing occurs in "large quantities." *Id.* ¶ 77, JA0688. FERC relied on data from 2018 to find that operators "frequently bias demand … by hundreds or even thousands of MWs." *Id.* (noting that during reserve shortages, the "*average* bias was 1,471 MW"). And data from a cold snap in 2019—a period illustrative of "particularly challenging operational conditions"—showed that operators "biased demand for reserves by between 1,328 MW and 2,048 MW on average across 576 five-minute intervals spanning those two days." *Id.* ¶ 78, JA0688. Thus, "PJM operators regularly need to procure thousands of additional MW of

reserves—quantities upward of 50-100%" of the minimum reserve requirements. *Id.* ¶ 80, JA0689.

Far from reflecting the value of these additional reserves, the vertical drops in the Demand Curve signal that once the minimum requirement is satisfied, additional reserves have no value. Given that, in reality, the need for reserves often "far exceed[s]" the minimum requirements, it is no surprise that PJM operators procure reserves outside of the market—paying costs greater than what the Demand Curve allows for in-market purchases. *Id.* ¶ 77, JA0688.

FERC thus correctly found that PJM's reserve market design "fails to recognize and consistently procure within-market a sufficient quantity of reserves to both satisfy" NERC's requirements and address significant "operational uncertainties." *Id.* ¶ 80, JA0689. Holding that result to be unjust and unreasonable, the Commission adopted a "downward-sloping demand curve" that was directly tied to operational uncertainties. *Id.* ¶ 219, JA0747. In sum, FERC correctly agreed with PJM that the ORDCs should "value reserves" that exceed the minimum requirements rather than considering them worthless. *Id.* FERC's findings in this regard were in perfect accord with prior orders finding vertical demand curves used in other markets to be unjust and unreasonable and directing their

replacement with downward-sloping demand curves. *See ISO New England Inc.*, 153 FERC ¶ 61,338 (2015).

**2.** The Remand Order did not engage in "reasoned decisionmaking" when it reversed this outcome. *Louisville Gas*, 988 F.3d at 846. And because its decision rested on findings that contradict the findings in the May 2020 Order, an even "more detailed justification" is required than what would normally pass for reasoned decisionmaking. *Fox Television*, 556 U.S. at 515.

The Remand Order dismissively characterized the May 2020 order as relying on "broad statements" about operational uncertainties. Remand Order ¶ 28, JA0903. That is incorrect: The May 2020 Order contained a detailed discussion and analysis of PJM's operational uncertainties, including a thorough account of PJM's proposal, comments and protests, PJM's answers, and FERC's own analysis of the foregoing. *See, e.g.*, May 2020 Order ¶¶ 159-166, JA0721-0724 (discussing PJM's proposal); *id.* ¶¶ 219-229, JA0747-0749 (discussing FERC's determination). Moreover, FERC's accusation that its prior order merely relied on "broad statements" is itself a "conclusory and unexplained statement" that "is not the 'reasoned' explanation required by the APA." *Environmental Health Trust v. FCC,* 9 F.4th 893, 909 (D.C. Cir. 2021).

In truth, it is the Remand Order's superficial treatment of the facts that fails to display reasoned decisionmaking. First, nowhere does FERC

address the comparative weight of PJM's operational uncertainties. Whereas the May 2020 Order acknowledged that PJM's minimum reserve requirements are "significantly lower as a percentage of system peak load" than "most other" regional transmission organizations due to its large system size (May 2020 Order ¶ 79, JA0688-0689), the Remand Order did not address the greater uncertainties this disparity produces. In omitting this consideration from its discussion, FERC "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

Second, FERC on remand decided that operator biasing was not a significant issue because operators biased forecasts upwards only "one third of the time," and at other times applied downward bias or no bias. Remand Order ¶ 38, JA0907-0908. FERC thus concluded that "PJM has failed to demonstrate the actual impacts that … bias has on PJM's market or its reserve levels." Remand Order ¶ 39, JA0908.

But the May 2020 Order explained, citing specific data from 2018 and 2019, that biasing did in fact impact the value of additional reserves. *See* May 2020 Order ¶ 78, JA0688 (stating that PJM operators "biased demand for reserves by between 1,328 MW and 2,048 MW on average across 576 five-minute intervals spanning those two days"). Downward biasing is irrelevant to the analysis; the fact that upward biasing occurs to the degree shown (especially when there is a heightened risk of power shortage) to

53

maintain a reliable system demonstrates conclusively that additional reserves beyond the minimum requirements are not worth *nothing*. The original Demand Curve does not "reasonably reflect the marginal cost of procuring *necessary* reserves" (May 2020 Order ¶ 74, JA0687 (emphasis added)), and FERC's Remand Order does not adequately explain the decision to reinstate it.

As Commissioner Danly observed, FERC "simply looks past the detailed evidence presented by PJM." Danly Dissent ¶ 12, JA0925. But FERC may not take an "ostrich's approach," where it "confine[s] its attention to evidence that support[s] its conclusion and … ignore[s] any contrary evidence." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. N.L.R.B.*, 802 F.2d 969, 975 (7th Cir. 1986); *see also Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence that undercuts its judgment … [or] minimize such evidence without adequate explanation."); *Tenneco Gas v. FERC*, 969 F.2d 1187, 1214 (D.C. Cir. 1992) ("[A] FERC order neglectful of pertinent facts on the record must crumble for want of substantial evidence."). The Remand Order and Rehearing Order fail to provide a "more detailed justification" for FERC's abrupt change of position, or to adequately "explain[] why [its prior findings] were mistaken, misguided, or the like." *Texas*, 20 F.4th at 991. The orders are therefore arbitrary and capricious.

## C.    FERC's reinstatement of the reserves price cap of $850/MWh was arbitrary and capricious.

FERC's orders are also arbitrary and capricious with respect to the specific magnitude of the Reserve Penalty Factor. Again, FERC failed to engage in "reasoned decisionmaking" by "articulat[ing] a satisfactory explanation for its action" (*State Farm*, 463 U.S. at 43, 52) including a "more detailed justification" for its change of position (*Fox Television*, 556 U.S. at 515).

The May 2020 Order recognized that ever since the price cap for sales in the energy market increased from $1,000/MWh to $2,000/MWh in 2016, sellers in the reserves market faced significant opportunity costs up to that level. May 2020 Order ¶ 82, JA0690; *see id.* ¶ 153, JA0719 ("[B]ecause generation resources can submit verified cost-based incremental energy offers up to $2,000/MWh, resources capable of providing reserves will more frequently face opportunity costs as high as $2,000/MWh."). When a seller chooses to commit resources as reserves at the maximum price of $850/MWh, it is potentially forgoing the opportunity to sell those same resources as energy for prices up to $2,000/MWh. PJM Transmittal 9, JA0014.

This "exacerbated" the problem of PJM operators resorting to out-of-market actions to procure reserves. May 2020 Order ¶ 82, JA0690. For example, "nearly half (46.2%) of the revenue for the provision of

Synchronized Reserves in PJM is paid through out-of-market, pay-as-bid uplift payments, rather than through market clearing prices." *Id.* And these out-of-market actions stifled "accurate reserves price formation." *Id.* In the May 2020 Order, FERC maintained its earlier view that "the costs of resources procured to alleviate shortages should be reflected in transparent market prices whenever possible," and "[p]ayments made only to individual resources and recovered in uplift fail to send clear market signals." *Id.* (quoting Order No. 719 Compliance Order, 139 FERC ¶ 61,057 at P 63).

Recognizing that resources will "frequently face opportunity costs as high as $2,000/MWh" given the energy price cap, FERC reasonably decided that PJM should be able to "procure reserves from resources with such an opportunity cost." May 2020 Order ¶ 153, JA0719. The common-sense solution was to revise the reserves price cap to match $2,000/MWh, which is what PJM proposed and what FERC initially did. *Id.*

Reversing that decision in its Remand Order, FERC stated that increased opportunity costs were not a problem because "there is usually reserve capacity available at a cost much less than $1,000/MWh." Remand Order ¶ 29, JA0904. And it found that high opportunity costs resulting in economic shortages were not likely to occur with "sufficient frequency" to make the $850/MWh price cap unjust and unreasonable. Remand Order ¶ 30, JA0905.

56

FERC's newfound fixation on reserves "usually" being available at a cost below $1,000/MWh and its assertion that shortages were unlikely to occur with "sufficient frequency" illogically presuppose some sort of "frequency" requirement. As a product, reserves are designed to address emergencies and sudden risks of power shortages. As the May 2020 Order acknowledged, although it is rare for energy prices to rise above $1,000/MWh, "they have done so under conditions of grid stress, and it is precisely at these moments of grid stress that reserve prices have to be allowed to reflect the market price of those services." May 2020 Order ¶ 150, JA0718 (citing P3 Answer at 9, JA0418). And the November 2020 Order explicitly disavowed any sort of "frequency" requirement. November 2020 Order ¶ 81, JA0848 ("The Commission did not accept the $2,000/MWh Reserve Penalty Factors on the basis of past frequency of a resource's opportunity costs reaching $2,000/MWh."). To the contrary, that order stated that "[t]he market price needs to capture these opportunity costs, *even if relatively rare*." *Id.*, JA0849 (emphasis added).

FERC's precedents confirm that frequency is not the concern; the concern is ensuring that market prices reflect costs. In requiring regional transmission organizations to raise their offer caps, FERC observed that although "offer caps may not bind frequently, the [FPA] requires the Commission to ensure that rates are just and reasonable." *Offer Caps in*

*Mkts. Operated by Regional Transmission Orgs. & Indep. Sys. Operators*, Order No. 831, 157 FERC ¶ 61,115 at P 36 (2016). And in an order addressing PJM price caps, FERC stated: "PJM has identified *seven events* occurring during *28 hours over the previous five years* when reserve shortage conditions have been experienced within the PJM region." *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,057 at P 63 (2012) (emphasis added). Despite that low frequency, FERC required revisions because "market prices for reserves have not reflected the cost and value of providing reserves during these periods." *Id.*

The Remand Order's unacknowledged deviation from these precedents violated the APA. *See Fox Television*, 556 U.S. at 515 (stating that an agency departing from its own precedent must "display awareness that it is changing position" and "show that there are good reasons for the new policy"); *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) ("It is textbook administrative law that an agency must 'provide[] a reasoned explanation for departing from precedent or treating similar situations differently,' … and Commission cases are no exception … ." (citation omitted)); *Panhandle E. Pipe Line Co. v. FERC*, 196 F.3d 1273, 1275 (D.C. Cir. 1999) ("As we have repeatedly reminded FERC, if it wishes to depart from its prior policies, it must explain the reasons for its departure." (citations omitted)).

58

In the Rehearing Order, FERC claimed that these agency precedents were inapposite. Rehearing Order ¶ 53, JA1014. For example, the Commission asserted that while Order No. 831 involved a showing of whether energy offer caps were "just and reasonable," it did not apply the standard under Section 206. *Id*. But that misses the point. Regardless of the applicable standard, these precedents make clear that there is no frequency requirement before a cap can be raised and that offer caps can and should be designed to address even infrequent circumstances in which higher prices are warranted.

The Remand Order also sought to minimize PJM's data establishing that "opportunity costs … exceeded $1,000/MWh on 3.6% of the days (70 of 1,947 days)." Remand Order ¶¶ 33-34, JA0906. FERC held that those data "say nothing about how often those resources with lost opportunity cost offers … would have been selected to provide Synchronized Reserve, even if the Reserve Penalty Factor were set at $2,000/MWh." *Id.* But as Petitioners pointed out in their request for rehearing, "operators can and do procure reserves at prices above $850/MWh, but compensate suppliers for those costs through uplift." Request for Rehearing at 17, JA0961. *See Tenneco Gas*, 969 F.2d at 1214 (finding that "a FERC order neglectful of pertinent facts on the record must crumble for want of substantial evidence").

The Rehearing Order briefly dismisses this as merely a "theoretically possible" occurrence. Rehearing Order ¶ 51, JA1012. That does a disservice to the extensive record evidence which the May 2020 Order fairly assessed *See, e.g.*, May 2020 Order ¶ 82, JA0690 ("[D]ata from the IMM's 2018 State of the Market Report shows that nearly half (46.2%) of the revenue for the provision of Synchronized Reserves in PJM is paid through out-of-market, pay-as-bid uplift payments, rather than through market clearing prices."); *id.* ¶ 92, JA0694 (noting that "nearly half of the payments to Tier 2 reserves come from uplift," which is "indicative of a flawed market design"); *see also* PJM Transmittal 34, JA0039.

FERC's Remand Order failed to grapple with serious arguments and substantial evidence concerning the reserves price caps. It is undisputed that the price cap "should be based on the opportunity cost of providing reserves instead of energy." PJM Answer at 32, JA0484; *see also* Remand Order ¶ 29, JA0904 (acknowledging that "[t]he costs of a resource providing reserves are mainly based on that resource's lost opportunity costs"). And the energy price cap is $2,000/MWh. It follows inexorably that "resources *can* face an opportunity cost well above $1,000/MWh, up to $2,000/MWh or higher," and that this will force operators to take actions to maintain reserves. PJM Answer at 50, JA0502 (citation omitted).

The Rehearing Order's treatment of this basic consequence of the current market design as a theoretical possibility, without further discussion, fails to "respond meaningfully" to the parties' concerns. *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005); *see also NorAm Gas*, 148 F.3d at 1165 (reversing order in which the Commission "not only failed to provide an adequate response to [petitioner's] argument, it failed to take seriously its responsibility to respond at all"); *K N Energy*, 968 F.2d at 1303 (agency must "engage the arguments raised before it" and thus "conduct a process of *reasoned* decisionmaking").

FERC's orders on remand do not display reasoned decisionmaking. And FERC failed to offer the detailed justification required by its abrupt about-face. For these reasons, too, the Remand Order and Rehearing Order must be set aside.

## CONCLUSION

The petition for review should be granted, and FERC's Remand Order and Rehearing Order should be vacated.

Dated: June 21, 2023                Respectfully submitted,


                                   /s/ *Paul W. Hughes*

                                   PAUL W. HUGHES
                                   DAVID G. TEWKSBURY
                                   ANDREW A. LYONS-BERG
                                   CONNOR J. SUOZZO
                                       *McDermott Will & Emery LLP*
                                       *500 North Capitol Street NW*
                                       *Washington, DC 20001*
                                       *(202) 756-8000*


                                   *Counsel for Petitioners*

62

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for Petitioners certifies that this brief:

(i)     complies with Rule 32(a)(7)(B) and the briefing schedule approved by this Court (*see* Dkt. 10) because it contains 13,361 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)     complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 365 and is set in New Century Schoolbook in a size equal to 14-point font.


Dated: June 21, 2023                      */s/ Paul W. Hughes*

**CERTIFICATE OF SERVICE**

I hereby certify that that on June 21, 2023, I filed the foregoing brief via the Court's CM/ECF system, which effected service on all registered parties to this case.

Dated: June 21, 2023                    /s/ *Paul W. Hughes*